## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| WHITE EAGLE ASSET PORTFOLIO, LP, WHITE EAGLE GENERAL PARTNER, LLC, and LAMINGTON ROAD DESIGNATED ACTIVITY COMPANY (f/k/a LAMINGTON ROAD LIMITED), | Case No. 18-12808 (KG) (Jointly Administered) |
| Debtors. | |
| EMERGENT CAPITAL, INC., WHITE EAGLE ASSET PORTFOLIO, LP, WHITE EAGLE GENERAL PARTNER, LLC, and LAMINGTON ROAD DESIGNATED ACTIVITY COMPANY (f/k/a LAMINGTON ROAD LIMITED), | |
| Plaintiffs, | Adv. Proc. No. 19-_____ |
| v. | |
| LNV CORPORATION, SILVER POINT CAPITAL L.P., and GWG HOLDINGS, INC., | |
| Defendants. | |

## COMPLAINT

Plaintiff Emergent Capital, Inc. ("Emergent") and Debtor-Plaintiffs White Eagle Asset Portfolio, LP ("White Eagle"), Lamington Road Designated Activity Company (f/k/a Lamington Road Limited) ("Lamington") and White Eagle General Partner, LLC ("White Eagle GP") (White Eagle, Lamington and White Eagle GP, collectively, the "Debtor-Plaintiffs"; and the Debtor-Plaintiffs and Emergent, collectively, "plaintiffs"), as and for their complaint against defendants LNV Corporation ("LNV"), Silver Point Capital L.P. ("Silver Point") and GWG Holdings, Inc.

("GWG") (collectively, "defendants"), hereby allege, upon knowledge as to themselves and upon information and belief as to all other matters, as follows:

<u>**INTRODUCTION**</u>

1.     This action arises out of defendants' scheme to coerce plaintiffs into selling their valuable portfolio of life insurance policies to defendants for well below its true value.

2.     Debtor-Plaintiff White Eagle owns a portfolio of nearly 600 life insurance policies, with a total face value of nearly $3 billion and a present value of more than $500 million.  White Eagle is a joint venture between plaintiff Emergent and defendant LNV, a subsidiary of Beal Bank ("Beal").  Pursuant to a loan agreement, LNV agreed to lend $370 million to White Eagle, and in connection therewith received a 45% equity stake in White Eagle.  That equity stake, and LNV's significant control over White Eagle under the loan agreement, creates a joint venture, and gives rise to fiduciary duties to White Eagle and Emergent, on the part of LNV.  In direct violation of those fiduciary duties, LNV induced White Eagle to enter into an onerous and unconscionable amended loan agreement in December 2016 and January 2017, and has been engaged in a concerted campaign to "squeeze" White Eagle and Emergent by improperly restricting their cash flow, in the hopes that White Eagle and Emergent will have no choice but to sell the valuable policy portfolio to LNV or one of its proxies at below its true value.

3.     Among other things, LNV has improperly and in bad faith exercised its "discretion" under the loan agreement's one-sided provisions in ways that have caused plaintiffs significant harm.  For example, the loan agreement provides that White Eagle (and, by extension, Emergent) may only participate in the cash flows generated by the policy portfolio when the loan-to-value ratio (the "LTV") is 65% or less.  But the loan agreement also gives LNV "reasonable" discretion to calculate the LTV.  LNV has used that discretion unreasonably to undervalue the policy portfolio in ways that improperly reduce the LTV and block White Eagle from receiving any cash generated

by its own assets – while LNV continues to hoard nearly all of the cash for itself.  In addition, LNV has improperly excluded from the LTV calculation the value of policies that have matured, improperly reducing the LTV; imposed usurious fees on White Eagle for so-called portfolio services that are unnecessary and could be obtained cheaper elsewhere; and refused to release to Emergent millions of dollars that it promised to release nearly two years ago.

4.    As it intended all along, LNV's improper conduct has vastly reduced the amount of cash that White Eagle and Emergent receive from the policy portfolio, and endangered the ongoing financial health of both companies.  Indeed, in the nearly two years since the loan agreement was amended, White Eagle has only been permitted by LNV to participate in the payment waterfall twice, for less than $1 million, while LNV has kept for itself the lion's share of the more than $111 million in cash that White Eagle's primary assets have generated over the same period.

5.    LNV's misdeeds have intentionally placed plaintiffs in an untenable and unreasonable position:  while both White Eagle and Emergent are indisputably solvent – indeed, even at LNV's improperly low valuations, their assets exceed their liabilities by between $150 million and $200 million – both plaintiffs face a threat of severe ongoing cash constraints in the near future, as White Eagle may not have sufficient cash flow to pay the premiums and other costs associated with its policy portfolio, and Emergent may not have sufficient cash flow to pay the debt and interest service on its own debt.  Remarkably, LNV has now seized on this fact to justify continuing its course of improper conduct:  according to LNV's counsel, White Eagle is no longer permitted to participate in the payment waterfall *at all* because White Eagle's parent company, Emergent, has "fail[ed] to take steps to improve its solvency in a manner acceptable to [LNV] (as determined in [its] sole and absolute discretion)."   In other words, LNV has unreasonably and improperly restricted plaintiffs' access to the cash generated by plaintiffs' own

assets, and LNV now points to that same lack of cash as a justification for its unreasonable and improper actions.

6.      After restricting plaintiff's access to cash to which they are rightfully entitled, LNV made repeated overtures to plaintiffs, suggesting that they sell their policy portfolio to one of "a number of buyers," *i.e.*, entities with whom LNV has conspired.  In the meantime, defendants Silver Point and GWG – a hedge fund and a competitor in the life settlement industry, respectively – have "independently" approached plaintiffs and offered to purchase White Eagle's policy portfolio.  Plaintiffs have learned that Silver Point and GWG are both backed by, and are working with, LNV – indeed, GWG is acting through an individual who, until recently, was the key LNV executive working on the White Eagle loan.  In other words, Silver Point and GWG are direct participants in LNV's conspiracy to expropriate plaintiffs' valuable assets.  In doing so, all three defendants have acted improperly.

7.      The end game of LNV's scheme is nearing completion.  LNV's improper conduct has caused the Debtor-Plaintiffs – consisting of White Eagle and its direct corporate parents – to seek protection under the Bankruptcy Code.

8.      Plaintiffs bring this action to put a stop to defendants' improper and unreasonable conduct, and to seek damages and other relief to undo the consequences of defendants' illegal actions.

## PARTIES

9.      Debtor-Plaintiff White Eagle is a Delaware limited partnership with its principal place of business in Bermuda.  White Eagle's general partner is White Eagle GP, a Delaware limited liability company.  All of White Eagle's limited partnership interests are owned by Lamington, an Irish designated activity company.  Lamington also owns 100% of White Eagle

GP.  Lamington is 100% owned by Markley Asset Portfolio, LLC ("Markley"); Markley is owned

100% by OLIPP IV, LLC ("OLIPP"); and OLIPP is 100% owned by plaintiff Emergent.

10.     Debtor-Plaintiff White Eagle GP is a Delaware limited liability company.  As noted

above, White Eagle GP is 100% owned by Lamington; Lamington is 100% owned by Markley;

Markley is owned 100% by OLIPP; and OLIPP is 100% owned by Emergent.

11.     Debtor-Plaintiff Lamington is an Irish designated activity company.  As noted

above, Lamington is 100% owned by Markley; Markley is owned 100% by OLIPP; and OLIPP is

100% owned by Emergent.

12.     Plaintiff Emergent is a Florida corporation headquartered in Florida, and a global

leader in the life settlements industry.  Emergent is the sole indirect owner of Lamington, White

Eagle's limited partner and the owner of White Eagle GP.

13.     Defendant LNV is a Nevada corporation with its principal place of business in

Texas.  LNV offers commercial lending services in the United States and is a wholly-owned

subsidiary of Beal Bank USA ("Beal").

14.     Defendant Silver Point Capital is a Delaware limited partnership with its principal

place of business in Connecticut.  Upon information and belief, Silver Point's general partner is

Silver Point Capital Management, LLC, a Delaware limited liability company ("Silver Point GP");

upon information and belief, Silver Point's limited partners and Silver Point GP's members are

residents of Connecticut, New York and New Jersey.  Silver Point is a hedge fund that focuses on

credit and special situations investments.

15.     Defendant GWG is a Delaware corporation with its principal place of business in

Minnesota.  GWG, through its subsidiaries, is also engaged in the life settlements industry.

## JURISDICTION AND VENUE

16.     Jurisdiction of this Court is founded upon sections 157 and 1334 of title 28 of the United States Code, in that this constitutes a civil proceeding arising under the Bankruptcy Code, or arising in or related to the above-captioned jointly administered chapter 11 cases under the Bankruptcy Code, which are pending in the United States Bankruptcy Court for the District of Delaware.

17.     This is a core proceeding under section 157(b)(2) (A), (B), (K) and (O) of title 28, United States Code.

18.     Venue in this Court is appropriate under section 1409(a) of title 28, United States Code.

## FACTUAL ALLEGATIONS

### I.     THE LIFE SETTLEMENT INDUSTRY

19.     A life settlement is a transaction in which an individual sells an insurance policy to a third-party investor for an amount less than the policy's face value, but greater than its net cash surrender value.  The investor becomes responsible for paying future premiums on the policy and, upon the death of the individual, receives the policy's death benefits.

20.     Life settlements allow senior insureds who can no longer afford their premiums, or who desire additional liquidity, to shed their policies for an immediate infusion of cash at a premium over the cash surrender value offered by the insurance companies.  The investor makes projections concerning the individual's probability of survival and life span, pays out the required premiums on the policy, and projects discounted cash flows for each policy.  The investor assumes the risk that the death benefit will be less than the sum of the purchase price, the aggregate future premiums and any additional fees.  The insured receives the benefit of an immediate cash payment in excess of the cash surrender value offered to the insured.

21.     Life settlement assets are subject to uneven cash flows that can be difficult to predict, and that can lead to liquidity issues if the benefit payouts received are insufficient to cover the cash outlays from operating expenses, the required premium payments, and the interest payments on the debt needed to finance the business.  However, the investment carries the benefit of cash flows that are uncorrelated to market returns.

## II.     EMERGENT, WHITE EAGLE AND THE LIFE SETTLEMENT PORTFOLIO

22.     White Eagle is an indirect subsidiary of plaintiff Emergent.  White Eagle owns a portfolio of 594 life insurance policies – also known as life settlements – with an aggregate death benefit of approximately $2.8 billion and a fair value (as calculated by LNV) of approximately $552 million as of October 31, 2018.  Each of these policies is pledged under a $370 million revolving credit facility with LNV (the "White Eagle Facility").

23.     White Eagle's indirect parent, Emergent, was founded in 2006 as Imperial Holdings, LLC (which later became Imperial Holdings, Inc., and, in 2015, changed its name to Emergent) and has been publicly traded since 2011.  Emergent's primary business is to act as a holding company for its indirect interests in White Eagle and White Eagle's portfolio of life insurance policies.

## III.    LNV, BEAL AND THE WHITE EAGLE FACILITY

24.     In 2012, Emergent (then still known as Imperial) approached CSG Investments, Inc., an affiliate of Beal, seeking a credit facility to assist the company's liquidity.

25.     Effective April 29, 2013, White Eagle's predecessor entity, White Eagle Asset Portfolio LLC, entered into the White Eagle Facility, a 15-year revolving credit agreement memorialized in a Loan and Security Agreement (the "Initial Loan Agreement") with LNV – a subsidiary of Beal – as lender, Imperial Finance & Trading LLC ("Imperial Finance") as servicer

and portfolio manager, and CLMG Corp. ("CLMG") as administrative agent.  CLMG is a wholly owned subsidiary of Property Acceptance Corp., which is in turn a wholly owned subsidiary of Beal Bank SSB.  Both Beal Bank SSB and LNV's parent, Beal Bank USA, are wholly-owned subsidiaries of Beal Financial Corporation (Beal Bank SSB, Beal Bank USA and Beal Financial Corporation are referred to herein as "Beal").

26.     The Initial Loan Agreement provided for an asset-based revolving credit facility backed by White Eagle's portfolio of life insurance policies with an initial aggregate lender commitment of up to $300 million, subject to borrowing base availability.  At the time of closing, White Eagle owned a portfolio of 459 life insurance policies with an aggregate death benefit of approximately $2.28 billion, which were pledged as collateral under the Initial Loan Agreement. Emergent was to receive an initial advance of $83 million, a priority payment of $76.1 million after paying down principal and interest, and a 50/50 split on net cash flows from death benefits between White Eagle and LNV after the priority payment was made.  LNV's 50% equity interest in White Eagle was subsequently reduced to 45%, as described below.

27.     On May 16, 2014, White Eagle Asset Portfolio LLC converted from a Delaware limited liability company into what is now White Eagle – a Delaware limited partnership – and its ownership interests were transferred to Lamington, an indirect, wholly-owned Irish subsidiary of Emergent.  In connection with the conversion, the White Eagle Facility was amended and restated in an Amended and Restated Loan and Security Agreement (the "Amended Loan Agreement") among White Eagle, as borrower; Imperial Finance as the initial servicer, initial portfolio manager and guarantor; Lamington Road Bermuda Ltd. ("Lamington Road Bermuda") as portfolio manager; LNV as lender and CLMG as administrative agent.  The financial terms remained the same as under the Initial Loan Agreement.

28.     The parties amended the Amended Loan Agreement on November 9, 2015 in a First Amendment to Amended and Restated Loan and Security Agreement (the "First Amendment"). Pursuant to the First Amendment, the maximum facility was reduced from $300 million to $250 million and the interest rate under the facility was increased by 50 basis points.  At the same time, the White Eagle Facility was restructured to provide earlier participation by White Eagle in the portfolio cash flows if certain loan to value ("LTV") ratios were achieved.  Effective with the First Amendment, ongoing advances could no longer be used to pay interest on the White Eagle Facility to LNV; instead, interest payments could be made only from proceeds received on White Eagle's policy portfolio (or, if they were insufficient, from White Eagle's available cash).  Pursuant to the First Amendment, White Eagle would receive a portion of the proceeds from its policies (after payment of fees and interest) of between 17.5% and 32.5% so long as the then-current LTV was below 50% (a figure that was raised to 65% in a subsequent amendment, as described below).

## IV.     THE 2016/2017 AMENDED LOAN AGREEMENT

### A.     LNV Induces White Eagle to Enter into an Unconscionable Agreement

29.     Emergent faced liquidity problems following entry into the White Eagle Facility due to a mismatch between cash inflows (death benefit payouts and fair value adjustment) and outflows (operating expenses and interest and premium payments), primarily due to legal and professional fees that exceeded $100 million between 2011 and 2015.

30.     In the fall of 2016, White Eagle approached LNV about restructuring the White Eagle Facility.  However, LNV saw plaintiffs' liquidity problems as an opportunity to take over plaintiffs' valuable life settlement portfolio for itself.  Accordingly, LNV forced White Eagle to accept terms that so heavily favor LNV that LNV clearly and indisputably had – and still has – as its ultimate goal the acquisition of 100% of White Eagle's portfolio.

31.     On December 29, 2016, under pressure from LNV, White Eagle and LNV entered into a Second Amendment to the Amended and Restated Loan Agreement (the "Second Amendment").  On January 31, 2017, in accordance with the Second Amendment, White Eagle and LNV executed the Second Amended and Restated Loan and Security Agreement, dated January 31, 2017 (as subsequently amended and/or restated, the "Second Amended Loan Agreement," or the "Loan Agreement"), which consolidated into a single document the Second Amendment and all prior amendments.  A copy of the Second Amended Loan Agreement – which governs the present relationship among the parties – is attached hereto as Exhibit A.

32.     Pursuant to the Second Amended Loan Agreement, 190 life settlement policies purchased from other wholly owned subsidiaries of Emergent were pledged as additional collateral under the White Eagle Facility for an additional policy advance of approximately $71.1 million (which in turn was used to pay down the debt (owed to LNV) of the subsidiaries that contributed the collateral).  The maximum facility amount was increased to $370 million and the term of the facility was extended to December 31, 2031.

**B.     The Loan Agreement's Onerous Terms**

33.     The Second Amended Loan Agreement provides LNV significant discretion on a number of material issues – discretion that LNV has abused throughout the course of its relationship with plaintiffs.  For example, pursuant to Section 5.2 of the Second Amended Loan Agreement, available amounts collected from matured life insurance policies are distributed through a waterfall.  (Ex. A, § 5.2.)  Fees and costs, including fees to the Custodian, the Securities Intermediary and the Administrative Agent are paid first.  (*Id.*)  Then LNV as Lender is entitled to receive the "Required Amortization," which is equal to the cash available at that point in the waterfall multiplied by a percentage (the "Cash Flow Sweep Percentage") that varies based on the

LTV of White Eagle's policy portfolio.  Specifically, if the LTV is greater than 65% – meaning that the outstanding amount of the loan equals more than 65% of the value of the policies as determined by LNV – 100% of the cash available for distribution at that point in the waterfall must be paid entirely to LNV as amortization of the principal due under the facility.

34.     The LTV calculation purportedly provides substantial discretion to LNV.  The LTV is defined as the outstanding amount of the facility divided by "the Lender Valuation of the Pledged Policies (other than any Excluded Policies), as determined by the Required Lenders *in their sole discretion*."  (Ex. A, Annex I at I-19 (emphasis added).)  The term "Lender Valuation" is defined to mean "on any date of determination, the value of the Pledged Policies (other than the Excluded Policies) as determined by the Required Lenders in their *reasonable* discretion."  (Ex. A at I-17 (emphasis added).)   The definition goes on to provide non-exclusive examples of certain methodologies and assumptions that might be reasonable.

35.     In addition, White Eagle is only entitled to receive proceeds under the waterfall if "EMG" (*i.e.,* Emergent – White Eagle's indirect parent who is not even a party to the Loan Agreement) maintains a Cash Interest Coverage Ratio – *i.e.*, the ratio of Emergent's cash to the interest due on Emergent's funded debt over the prior year – of at least 2.0:1 at any time during the immediately preceding calendar quarter and does not fail to take steps "to improve its solvency in a manner acceptable to the Required Lenders (as determined in their *sole and absolute discretion*)."  (Ex. A, Annex I at I-5-6.)  And beginning in July 2019, the failure of EMG to maintain a Cash Interest Coverage Ratio of at least 1.75:1 will give rise to an Event of Default. (Ex. A, § 10.1(x).)

## V.      EMERGENT AND LNV ARE JOINT VENTURE PARTNERS IN WHITE EAGLE

36.     As a result of the Second Amended Loan Agreement, LNV exercises a controlling influence over the management and policies of White Eagle.  In addition, LNV shares significantly in the profits and losses of the company.  LNV's equity interest in, and managing control over, White Eagle render LNV a joint venture partner with White Eagle's other equityholders, Lamington and White Eagle GP.

37.     First, the Second Amended Loan Agreement provides LNV with a "Participation Interest" equal to 45% (originally 50%) of the revenue generated by White Eagle's loan settlement portfolio (after certain fees, interest and required amortization has been paid).  (Ex. A, Annex I, at I-22.)  Accordingly, LNV has a 45% equity stake in White Eagle's sole asset, its life settlements portfolio (*i.e.*, LNV's "45% Equity Position").  Indeed, LNV has asserted that this 45% stake survives repayment and termination of LNV's loan commitment, and even survives a default by LNV to make advances in the first place.  (Ex. A, § 10.3.)  In other words, White Eagle must pay LNV a 45% share of the profits even if LNV no longer has a single loan outstanding – a residual claim on future profits that is the very definition of an equity interest.  LNV's 45% stake makes it the second largest equity holder in White Eagle and effectively prevents White Eagle from accessing alternative sources of capital.

38.     LNV received its 45% Equity Position as part of the consideration for its loan to White Eagle under the White Eagle Facility (the "Loan").  In other words, LNV provided the Loan to White Eagle, and in exchange received a promissory note for the face value of the Loan, as well as the 45% Equity Position.  LNV's 45% Equity Position essentially served as an equity "kicker" (akin to shares of stock or warrants) for LNV, on top of White Eagle's obligation to pay the face amount of the Loan.  As a result, the 45% Equity Position constitutes an "Original Issue Discount," or "OID."  An OID is a discount from the face value of debt at the time the debt is issued that

reflects the fact that the lender paid less than the face amount of the debt in exchange for the debt. Essentially, when LNV received the 45% Equity Position in addition to the note, LNV paid less than the face amount of the note in exchange for the note – LNV received a note for a face value of more than it provided to White Eagle, when LNV's equity kicker is taken into account.

39.     Second, LNV exerts extensive day to day control over White Eagle's management and policies.  For example, LNV must approve White Eagle's acquisition of any additional policies.  (Ex. A, § 9.2(a)(l).)  White Eagle also cannot sell, transfer, or convey any assets without LNV's permission (Ex. A, § 9.2(a)(j)), and the sale and/or abandonment of a policy is subject to LNV's right of first offer (Ex. A, § 2.7).  Furthermore, White Eagle cannot improve the overall portfolio by trading riskier policies that would subject it to higher litigation risk without LNV's approval, which to date has not been forthcoming.

40.     Life settlements often result in litigation with insurance companies, which frequently contest their obligation to provide coverage under the applicable policies, even after having received years of premiums thereunder.  Under the Loan Agreement, White Eagle is required to consult with LNV's captive Administrative Agent in connection with the defense of any lawsuit, and LNV must approve any settlement agreement.  (Ex. A, § 9.1(g) and (u).)  In other words, LNV essentially controls all of White Eagle's litigation strategy – notwithstanding the fact that LNV does not bear any of the litigation risk or cost.  Specifically, the priority of payments waterfall is calibrated by LNV so that LNV is still made whole on its 45% equity participation in the portfolio *even if* a policy payout is reduced below face value as a result of litigation between White Eagle and an insurance carrier.  (Ex. A, § 5.2.)  At the same time, White Eagle also is responsible for paying all litigation expenses incurred in connection with defending its policies – meaning that White Eagle has essentially guaranteed to LNV full payment on every policy in its

portfolio, and bears all of the risk and costs associated with litigation over those policies.  (Ex. A, § 9.1.)

41.    LNV also controls the selection of the key agents and intermediaries who service and manage White Eagle's portfolio of life settlements, including the Portfolio Servicer, Securities Intermediary and Portfolio Manager.  (Ex. A.)  And under Section 9.1(d)(vi) of the Second Amended Loan Agreement, White Eagle also is required to submit an annual budget to LNV detailing every material expenditure by White Eagle, including premium payments, servicer fees, securities intermediary fees, audit fees and administrative agent fees.  LNV has "sole discretion" under the Loan Agreement to approve the amounts set forth in the budget and any increases or decreases.  (Ex. A, § 9.1(d)(vi).)

## VI.    DEFENDANTS CONSPIRE TO APPROPRIATE WHITE EAGLE'S VALUABLE LIFE SETTLEMENT PORTFOLIO

### A.    LNV Abuses the Discretion It Was Afforded Under the Loan Agreement to Put Improper Pressure on White Eagle

42.    In furtherance of its scheme to expropriate White Eagle's business, LNV not only inserted onerous terms in the Second Amended Loan Agreement that favored it exclusively, but then has proceeded to apply those provisions in bad faith in an overt and improper attempt to force White Eagle to declare bankruptcy and sell its valuable loan settlement portfolio to LNV for a fraction of its true value.

43.    LNV has manipulated and abused the discretion it provided itself under the onerous and unconscionable provisions of the Second Amended Loan Agreement in order to deny White Eagle the cash flow that it needs to maintain its policy portfolio and provide cash for Emergent to pay its own bondholders.  The goal of LNV's manipulation and abuse indisputably is to choke off White Eagle's access to cash and force White Eagle into a restructuring through which LNV, or

one of its proxies, will be able to purchase White Eagle's valuable portfolio for well below what it is worth.

44.     First, as discussed above, through the Second Amended Loan Agreement, LNV successfully obtained a significant change to the waterfall for distribution of proceeds from the policies pledged as collateral under the White Eagle Facility.  White Eagle is only entitled to receive proceeds under the waterfall (after all fees and expenses are paid) if the LTV ratio is 65% or less, and if its indirect parent, Emergent, maintains the requisite Cash Coverage Ratio.  Because LNV determines the value of the policies – the "Lender Valuation" that is the numerator in the calculation of LTV – LNV has significant discretion in determining the LTV, and therefore in determining whether White Eagle (and, indirectly, Emergent) will receive any of the cash generated by White Eagle's policies.

45.     Although White Eagle values its own portfolio on a quarterly basis, and hires an independent expert, Lewis & Ellis Inc. ("Lewis & Ellis"), to independently review its portfolio valuation on an annual basis, LNV has engaged a separate company, Dominion Due Diligence Group ("D3G"), to value the portfolio at White Eagle's expense.  LNV unreasonably requires White Eagle to use only D3G's valuations to calculate its payment obligations under the waterfall. (Ex. A § 5.5.)  D3G routinely values policies well below the value calculated by the company or Lewis & Ellis, but unreasonably refuses to provide any meaningful visibility into its methodology.

46.     D3G's valuations are plainly unreasonable, in breach of the Loan Agreement, and LNV has abused its discretion under the Lender Valuation provision to artificially inflate the LTV above 65% to prevent White Eagle from receiving distributions under the waterfall, thereby denying White Eagle much needed cash flow over the past 21 months.  Indeed, in the nearly two years since the Second Amended Loan Agreement was executed, White Eagle has participated in

the waterfall just twice, receiving a total of $985,885, compared to over $111 million that has been paid to LNV.

47.     Second, LNV has unreasonably excluded matured policies from its calculation of LTV by removing those policies completely from the list of policies used in their Lender Valuation, while at the same time refusing to include the value of the expected life benefit amount as an account receivable.  In other words, LNV refuses to give any credit whatsoever for policies that have matured until White Eagle actually receives the cash from the life insurance carrier.  This artificially reduces the Lender Valuation, increases the LTV, and reduces the amount of cash that White Eagle is able to draw upon through the payment waterfall under the Loan Agreement. Although LNV has recognized that the failure of the Second Amended Loan Agreement to account for matured policies was an "oversight," and easily fixable without an amendment, they have refused to take any action to correct the issue, ignoring numerous requests from White Eagle to rectify what is clearly a typographical error.  LNV's refusal has allowed it to further deprive White Eagle (and, indirectly, Emergent) of much needed cash flows.

48.     Third, LNV has also depressed the amount of funds available to White Eagle by imposing usurious fees that are payable quarterly to its affiliates, and which are deducted first under the waterfall, or are otherwise payable solely by White Eagle out of funds it receives only after amortization, interest and other charges have been paid.  (Ex. A, §§ 5.2, Annex I at I-13.) Under the Second Amended Loan Agreement, LNV approves the expenses to be funded in each calendar year in its "sole and absolute discretion."  (Ex. A, Annex I, at I-13.)  LNV has abused that discretion by approving usurious fees and by refusing to consider substituting lower cost providers.

49.     For example, LNV requires that White Eagle pay the expenses of D3G as backup servicer and portfolio valuation provider (on top of the expenses of White Eagle's Servicer, which

also values the portfolio).  D3G charges fees that are three to four times the market rate for such services.

50.     White Eagle has no choice but to pay the fees imposed by LNV or be declared in default under Section 10.1 of the Second Amended Loan Agreement.  LNV's bad faith has deprived White Eagle of millions of dollars in needed cash flow that would otherwise have flowed to White Eagle under the waterfall.

51.     Fourth, LNV has withheld millions of dollars in advances that it owes to White Eagle.  When the Second Amendment increased the White Eagle Facility from $250 million to $370 million, the additional proceeds were used by White Eagle to purchase additional life insurance policies from the Red Falcon Trust ("Red Falcon"), a Delaware statutory trust and an affiliate of White Eagle, which paid off and terminated a separate credit facility.  Pursuant to the Second Amendment, certain non-financed life insurance policies previously held by Red Falcon were also contributed to White Eagle as collateral.

52.     In exchange for this additional collateral, as part of the Second Amendment, LNV advanced an additional $6 million of proceeds to pay transaction closing costs and to pay future debt services and ongoing maintenance costs of the White Eagle Facility.  LNV and White Eagle expressly agreed that these proceeds would be released to White Eagle (and, ultimately, Emergent) after Emergent completed a July 2017 recapitalization, pursuant to which Emergent exchanged much of its existing debt for new debt with longer maturities and, in some cases, lower interest rates, and obtained equity investments from additional investors (the "Recapitalization").  However, at the eleventh hour before the closing, LNV restricted those funds and, pursuant to Section 5.1(c) of the Second Amended Loan Agreement, required that they be deposited in an Eligible Account for the benefit of the Administrative Agent.  LNV allowed White Eagle to use

only $388.069.36 of the proceeds to pay certain costs and expense incurred in connection with the transactions contemplated by the Second Amendment. LNV unreasonably required White Eagle to agree not to withdraw the balance of the $6 million for any purpose other than to pay Debt Service and Ongoing Maintenance Costs. LNV represented to White Eagle that the restrictions on the $6 million would last only until Emergent, White Eagle's indirect parent, completed the Recapitalization. However, LNV has continued to restrict White Eagle's access to the balance of the $6 million in bad faith despite repeated assurances that it would be released, and despite the fact that Emergent's Recapitalization closed on July 28, 2017

53.     Finally, adding insult to injury, LNV has cited the success it has achieved in strangling White Eagle's cash flows to justify, retroactively and prospectively, its right to do so. While White Eagle and Emergent are indisputably solvent – indeed, even utilizing LNV's improperly low valuations of White Eagle's policy portfolio, Emergent's assets exceed its liabilities by more than $150 million, and White Eagle's balance sheet is even further in the black since it does not include any of the debt at the Emergent level – LNV has invoked a provision in the Loan Agreement ostensibly permitting it to withhold any and all distributions to White Eagle if *Emergent* – which is not even a party to the Loan Agreement – "fails to take steps to improve its solvency in a manner acceptable to [LNV] (as determined in [its] sole and absolute discretion)." (Ex. A, Annex I at I-5.)

54.     Specifically, in early November 2018, LNV's bankruptcy counsel wrote counsel for White Eagle and Emergent, stating that "the calculation of the Lender Valuation is irrelevant for purposes of determining what percentage of collections White Eagle is permitted to retain under the waterfall," since "Emergent faces imminent insolvency and does not currently have access to new equity capital or debt service relief that would relieve such insolvency." But any "insolvency"

faced by Emergent is due to LNV's improper actions, as detailed above, which have strangled White Eagle's and, in turn, Emergent's, access to the significant cash flows generated by White Eagle's policy portfolio.  As a result of all of these improper manipulations by LNV, few if any funds generated from maturing policies in White Eagle's portfolio have flowed to White Eagle. Instead, the vast majority of funds – 98% – have flowed to LNV to reduce White Eagle's outstanding debt.  For LNV to rely on the consequences of its own improper conduct to justify continuing that same conduct is the epitome of bad faith, and that bad faith has caused plaintiffs significant damages.

> **B.      LNV Conspires with Silver Point and GWG
> to Appropriate White Eagle's Valuable Life Settlement Portfolio**

55.     The culmination of LNV's improper machinations has been its attempt (now successful) to force plaintiffs into bankruptcy, while at the same time sending purported third parties – who in actuality represented LNV and its corporate parent, Beal – to propose purchasing White Eagle's portfolio in order to stave off bankruptcy.  LNV thus not only improperly put financial pressure on White Eagle as a result of its bad faith maneuvers under the Second Amended Loan Agreement, but also wrongly conspired with Silver Point and GWG to appropriate White Eagle's valuable portfolio of life settlements for its own benefit.

56.     First, LNV counsel repeatedly encouraged Emergent to consider filing for bankruptcy, and stated there was more than one party that might bid on White Eagle's portfolio.

57.     Second, Silver Point has made overtures to purchase the policy portfolio from White Eagle.  On March 22, 2018, Silver Point called an Emergent board member to arrange a call concerning Silver Point's potential purchase of the White Eagle portfolio.  At a meeting on May 8, 2018, Silver Point offered to take on White Eagle's debt to LNV as part of its potential purchase of the portfolio, but insisted that the transaction had to close by year end.

58.     During and after plaintiffs' discussions with Silver Point, at least two different individuals, purportedly acting separately, approached Emergent and suggested they could help facilitate a deal with Silver Point.  On information and belief, both individuals – Edward Siskin and Steven Stanton – were working with and/or on behalf of not only Silver Point, but LNV and its corporate parent, Beal.

59.     Third, plaintiffs were approached by GWG, a competitor to White Eagle and, on information and belief, a major borrower of Beal.  On August 15, 2018 – at the very time White Eagle and Emergent representatives were meeting with LNV and Beal representatives at Beal's offices, purportedly in good faith – GWG announced that Brian Bailey, the lead Beal officer responsible for negotiating with White Eagle on behalf of LNV, had been named Chief Investment Officer of GWG.  A month later, in September 2018, Bailey offered to buy White Eagle's portfolio, purportedly on behalf of GWG, and advised White Eagle that LNV was eager to sever its relationship with White Eagle and Emergent.  Meanwhile, Steve Stanton – who previously purported to offer to help plaintiffs make a deal with Silver Point – in mid-October 2018 began to work on GWG's behalf in its negotiations with plaintiffs.  Nevertheless, in November 2018, Stanton indicated he was still in communication with Silver Point, and privy to Silver Point's negotiation strategy.

60.     White Eagle has subsequently learned that LNV, through its parent, Beal, was behind all of the offers White Eagle had received from both Silver Point and GWG.  In other words, LNV was attempting to use its improper leverage under the Loan Agreement to strangle White Eagle's cash and pressure plaintiffs into filing for bankruptcy and selling the valuable life insurance portfolio to Silver Point or GWG, who were in fact acting on LNV's behalf.

61.      Defendants' recent reaction to a change in the actuarial tables of the industry's key actuarial firms further evidences their collusion.  In October and November 2018, those firms – AVS and ITM TwentyFirst – announced that they would be releasing updated maturity tables. Those tables have a significant effect on the life expectancies of the insureds under the life policies in White Eagle's portfolio – but the precise effect will depend on the exact nature of the firms' update, which is as yet unknown.  Nevertheless, within days of each other, LNV, Silver Point and GWG all communicated to plaintiffs that they believed that the change in actuarial tables negatively impacted the value of plaintiffs' portfolio and, in GWG's and Silver Point's case, negatively impacted the consideration that they would be offering plaintiffs to purchase that portfolio.  Notably, this information was provided by the same individual – Steve Stanton – for both GWG and Silver Point.  On information and belief, all three defendants communicated with each other, and acted in concert, in connection with their reaction to the actuarial firms' announcements, as well as with their approach to plaintiffs regarding the same.

62.      At no time did Silver Point or GWG ever disclose to plaintiffs that they were acting as LNV's proxies.

## VII.    EMERGENT AND WHITE EAGLE HAVE BEEN AND CONTINUE TO BE DAMAGED BY DEFENDANTS' CONSPIRACY

63.      Defendants' conspiracy has greatly damaged plaintiffs.  Through their improper actions, they have deprived White Eagle and Emergent of millions of dollars in cash flow.  By strangling plaintiffs' access to the proceeds of their own assets, defendants have forced plaintiffs into bankruptcy (or the precipice thereof), endangering the future of the companies, their businesses and their employees.  Among other things, defendants' actions have endangered White Eagle's ability to pay the premiums on the life insurance policies in its portfolio.  Failure to pay the premium on a policy will, obviously, lead to its cancellation.  In other words, defendants are

endangering White Eagle's ability to maintain its most valuable asset.  Meanwhile, Emergent's sole source of revenue is the cash generated by White Eagle's policies.  By cutting off that cash, defendants have affected Emergent's ability to pay its debt, and have thereby threatened Emergent's ability to continue as a going concern.

64.     Plaintiffs therefore have commenced this action to remedy the significant damages caused by defendants' improper conduct.

**First Cause of Action**
**(Breach of Contract)**
**(As Against LNV)**

65.     Plaintiffs incorporate Paragraphs 1 through 64 as if fully set forth herein.

66.     The Loan Agreement is a valid and binding agreement between White Eagle and LNV, to which White Eagle is a party and Emergent is an intended third-party beneficiary.

67.     Plaintiffs have performed and are ready, willing, and able to continue to perform their obligations under the Loan Agreement.

68.     Pursuant to the Loan Agreement, LNV was required to use its "reasonable discretion" in determining the value of White Eagle's life insurance policies in connection with the calculation of the Lender Valuation and the LTV, and to use its "reasonable judgment" in making changes to the methodology used to value the policies.

69.     LNV failed to use its "reasonable discretion" or its "reasonable judgment" in valuing White Eagle's life insurance policies.  Instead, LNV consistently, intentionally, improperly and unreasonably undervalued White Eagle's policies, in order to deflate the Lender Valuation, inflate the LTV, and reduce (and in many cases eliminate) the cash flows available to plaintiffs under the Loan Agreement's priority of payments waterfall.

70.     LNV's conduct, as described above, is outrageous, intentional, malicious, willful, and in blatant or reckless disregard of plaintiffs' rights.

22

71.     As a result of LNV's bad faith and predatory conduct, plaintiffs have been damaged in an amount to be determined at trial, including the amount of distributions that should have and would have been made to White Eagle and Emergent but for LNV's unreasonable and bad faith conduct, as well as punitive and exemplary damages, interest, costs and attorneys' fees.

72.     Further, plaintiffs are entitled to an order requiring LNV to specifically perform its obligations under the Loan Agreement, including to calculate the Lender Valuations and LTV reasonably and in good faith, and distribute the proceeds of White Eagle's portfolio in accordance with the waterfall set forth in the Loan Agreement.

<u>**Second Cause of Action**</u>
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**
**(As Against LNV Corporation)**

73.     Plaintiffs incorporate Paragraphs 1 through 64 as if fully set forth herein.

74.     The Loan Agreement is a contract, to which White Eagle is a party and of which Emergent is an intended beneficiary.

75.     Implicit in every contract, including the Loan Agreement, is an implied covenant of good faith and fair dealing.

76.     LNV breached this implied covenant through its conspiratorial, bad faith and predatory conduct, as described above, in applying an unreasonable and improper valuation to White Eagle's portfolio of policies; excluding the value of matured policies from such valuation; refusing to release to White Eagle and Emergent funds that it promised to release prior to the execution of the Loan Agreement (a promise that LNV has never denied); imposing usurious fees on White Eagle; and citing the results of its efforts to strangle Emergent's cash flow to justify further strangling that same cash flow, and has thereby deprived plaintiffs of the benefits to which they are entitled under the Loan Agreement.

77.     LNV also breached the implied covenant by abusing the discretion afforded it under the Loan Agreement, including the "reasonable discretion" with which it may calculate the Lender Valuation; the "sole discretion" with which it may calculate the LTV; and the "sole and absolute discretion" with which it may determine whether Emergent has "improve[d] its solvency."

78.     LNV's conduct, as described above, is outrageous, intentional, malicious, willful, and in blatant or reckless disregard of plaintiffs' rights.

79.     As a result of LNV's bad faith and predatory conduct, plaintiffs have been damaged in an amount to be determined at trial, including the amount of distributions that should have and would have been made to White Eagle and Emergent but for LNV's unreasonable and bad faith conduct, as well as punitive and exemplary damages, interest, costs and attorneys' fees.

80.     Further, plaintiffs are entitled to an order requiring LNV to specifically perform its obligations under the Loan Agreement, including to calculate the Lender Valuations and LTV reasonably and in good faith, and distribute the proceeds of White Eagle's portfolio in accordance with the waterfall set forth in the Loan Agreement.

### Third Cause of Action
### (Breach of Fiduciary Duty)
### (As Against LNV Corporation)

81.     Plaintiffs incorporate Paragraphs 1 through 64 as if fully set forth herein.

82.     As discussed above, LNV, White Eagle and Emergent intended to and did create a joint venture by virtue of the Loan Agreement.  LNV and Emergent mutually contributed property, financial resources and effort into White Eagle as a joint undertaking, in which they intended to be associated as joint venturers to create an enterprise for profit.  Further, LNV maintained significant control over White Eagle through the onerous terms in the Loan Agreement.  Finally, LNV shares in White Eagle's profits and losses through the LNV 45% Equity Position, and

through LNV's sole recourse to the assets of White Eagle, which consist solely of the policy portfolio.

83.     As a joint venturer, LNV owed the joint venture, White Eagle, and its joint venture partner, Emergent, fiduciary duties.  Such fiduciary duties include (among others) the duties of care, good faith, loyalty and candor.

84.     LNV breached its fiduciary duties to plaintiffs by (i) using its position to favor itself at the expense of plaintiffs, including (among other things) through its unreasonable and bad faith valuations of White Eagle's loan portfolio, which enabled LNV to siphon cash from the joint venture for its own benefit and to the detriment of White Eagle and Emergent; and (ii) using its position in an attempt to force plaintiffs into a distressed sale of their life settlements portfolio.

85.     Defendants' conduct, as described above, was outrageous, intentional, malicious, willful, and in blatant or reckless disregard of plaintiffs' rights.

86.     Plaintiffs are entitled to damages in an amount to be proven at trial, as well as punitive and exemplary damages, interest, costs and attorneys' fees.

**<u>Fourth Cause of Action</u>**
**(Aiding and Abetting Breach of Fiduciary Duty)**
**(As Against Silver Point and GWG)**

87.     Plaintiffs incorporate Paragraphs 1 through 64 and 81 through 86 as if fully set forth herein.

88.     As discussed above, LNV, White Eagle and Emergent intended to and did create a joint venture by virtue of the Loan Agreement.

89.     By virtue of their relationship with and diligence of LNV and the Loan Agreement, and in particular the fact that GWG's actions were led by a former executive of LNV, Silver Point and GWG were aware of the joint venture, and therefore aware of the fiduciary duties created thereby.

90.     Silver Point and GWG knowingly, intentionally and substantially assisted in, participated in, and induced LNV's breach of its fiduciary duties to plaintiffs, by intentionally participating in a scheme to use improper pressure and coercion to purchase plaintiffs' most valuable asset, *i.e.*, their valuable portfolio of life insurance policies, at well below that asset's true value.

91.     Defendants' conduct, as described above, was outrageous, intentional, malicious, willful, and in blatant or reckless disregard of plaintiffs' rights.

92.     Plaintiffs are entitled to damages in an amount to be proven at trial, as well as punitive and exemplary damages, interest, costs and attorneys' fees.

**Fifth Cause of Action**
**(Civil Conspiracy)**
**(As Against All Defendants)**

93.     Plaintiffs incorporate Paragraphs 1 through 92 as if fully set forth herein.

94.     Defendants conspired with one another to attempt to force plaintiffs into bankruptcy or an out-of-court restructuring, by, among other things, (i) failing to disclose to plaintiffs during negotiations that they were conspiring and colluding with each other, and not acting independently, in making offers to purchase White Eagle's policy portfolio; and (ii) attempting to purchase White Eagle's portfolio at below the portfolio's fair value.

95.     Defendants undertook their wrongful, intentional and unjustifiable acts in furtherance of their ongoing conspiracy through, among other things, breach of fiduciary duty; aiding and abetting breach of fiduciary duty; and tortious interference with contract.

96.     Defendants' conduct, as described above, was outrageous, intentional, malicious, willful, and in blatant or reckless disregard of plaintiffs' rights.

97.     Plaintiffs are entitled to damages in an amount to be proven at trial, as well as punitive and exemplary damages, interest, costs and attorneys' fees.

## Sixth Cause of Action
### (Declaratory Judgment for Recharacterization of Debt as Equity)
### (As Against LNV)

98.     Debtor-plaintiff White Eagle incorporates Paragraphs 1 through 64 as if fully set forth herein.

99.     Pursuant to the equitable powers granted to the Court by 11 U.S.C. § 105(a) and principles of recharacterization, the Court may look beyond the form of a transaction and consider the substance of the transaction to determine whether it should be recharacterized from debt to equity, when the parties to the transaction in question intended an interest that is denominated as a "debt" to be an equity interest or where it appears from the nature of the transaction that a purported debt is in fact an equity interest.

100.    Although LNV purports to be solely a lender to White Eagle, a significant portion of any claim it asserts against White Eagle in fact constitutes equity. Specifically, the LNV 45% Equity Position is based on a transaction that was in actuality equity. Among other features, the value and amounts paid or payable in respect of the LNV 45% Equity Position are dependent on the success of the Debtors' business.

101.    Indeed, LNV expressly has taken the position that the LNV 45% Equity Position "survives the repayment of the other Obligations …, and the termination of the Lender's commitments, under the White Eagle Credit Agreement." In other words, under LNV's theory, the continuation of the LNV 45% Equity Position is not anchored or connected in any way to the existence of any outstanding obligations on account of the loans extended by LNV under the Loan Agreement. As such, the LNV 45% Equity Position constitutes an equity position in White Eagle. Like stock or warrants given to a lender as part of the consideration for a loan, according to LNV, the LNV 45% Equity Position is a vested interest in profits or cash flow that survives the payment of all amounts borrowed.

102.    To characterize the LNV 45% Equity Position as debt would disregard the substance of the interest in White Eagle that the LNV 45% Equity Position represents and result in injury to White Eagle, its creditors and its other stakeholders, including Emergent, and would confer an unfair advantage on LNV by allowing LNV to reap the fruits of the misconduct in which it engaged.

103.    The recharacterization of the LNV 45% Equity Position from debt to an equity interest is consistent with the substance of the transaction and the policies of the Bankruptcy Code.

104.    The LNV 45% Equity Position should be treated in its entirely as an equity interest that ranks below the claims of White Eagle's creditors, subject to equitable subordination as described below.

**Seventh Cause of Action**
**(Declaratory Judgment for Disallowance of Portion of LNV Claim Against White Eagle Representing Unmatured Original Issue Discount)**
**(As Against LNV)**

105.    Debtor-plaintiff White Eagle incorporates Paragraphs 1 through 64 and 98 through 104 as if fully set forth herein.

106.    Pursuant to the Loan Agreement, as of the Second Amended Loan Agreement, LNV received a promissory note issued by White Eagle, in the face amount of any advances made by LNV on its Loan, up to $370 million.

107.    Pursuant to the Loan Agreement, LNV also received the 45% Equity Position, as described above.

108.    White Eagle provided the 45% Equity Position to LNV as partial consideration for LNV's advances on its Loan. While LNV advanced money under the Loan Agreement in exchange for the note provided by White Eagle, some portion of LNV's advances were consideration for the 45% Equity Position, not the note; the amount advanced by LNV was less

than the sum of the face amount of the note and the value of the 45% Equity Position. That difference or shortfall – equivalent to the value of the 45% Equity Position when received by LNV – constitutes Original Issue Discount, or OID.

109.    Under the Bankruptcy Code, the allowed claim of a creditor, whether secured or unsecured, whose claim includes OID, does not include OID that was unamortized or unmatured as of the effective date of the debtor's plan of reorganization. Any claim for such unamortized OID that is attributable to the period between the effective date of the plan and the stated maturity (without acceleration) of the debt to LNV is disallowed. Consequently, the claim of LNV based on its advances (i.e., the face amount purportedly owed on the note for advances) must be reduced by the amount of such unamortized OID, and only the balance allowed. Even if a secured creditor is oversecured and entitled to post-petition interest under section 506 of the Bankruptcy Code, its allowed secured claim will only include OID that has accreted during the pendency of the case between the filing of the bankruptcy petition and the effective date of the plan, and not OID which is unamortized as of the effective date and would accrete thereafter.

110.    Accordingly, the Court should declare that, pursuant to sections 502(b)(2) and 506 of the Bankruptcy Code, (i) LNV is not entitled to an allowed claim against White Eagle to the extent of any unamortized OID as of the effective date of any plan of reorganization of White Eagle (the "Effective Date"); and (ii) the amount of such unamortized OID must be deducted from the face amount of LNV's note in determining the allowed amount of its claim.

**Eighth Cause of Action**
**(Declaratory Judgment for Disallowance of Portion of LNV Claim Against**
**White Eagle Representing Post-Effective Date Interest)**
**(As Against LNV)**

111.    Debtor-plaintiff White Eagle incorporates Paragraphs 1 through 64 as if fully set forth herein.

112.    In the alternative to Causes of Action Sixth and Seventh, to the extent the Court finds that the LNV 45% Equity Position does not constitute an equity interest in White Eagle, and that the value of the 45% Equity Position does not constitute OID (the unamortized portion of which should be deducted in allowing LNV's claim), then the 45% Equity Position necessarily constitutes additional interest on LNV's loan, which matures only as amounts become due and owing with respect to the 45% Equity Position.

113.    Under the Bankruptcy Code, the allowed claim of a creditor, even if secured or oversecured, does not include, and such creditor is not entitled to recover, any interest that has not yet matured at the time of the effective date of the debtor's plan of reorganization.  Any claim for such post-effective date interest is disallowed.  Instead, even the oversecured creditor is entitled to post-plan effective date interest on its allowed secured claim only as provided under a confirmed plan of reorganization.

114.    Accordingly, should the Court find that the 45% Equity Position does not constitute an equity interest in White Eagle or OID (the unamortized portion of which should be deducted in allowing LNV's claim), the Court should declare that, pursuant to section 506(b) of the Bankruptcy Code, LNV is not entitled to an allowed claim against White Eagle to the extent of any portion of the LNV 45% Equity Position that has not yet accrued or matured as of (or after) the Effective Date.

**Ninth Cause of Action**
**(Equitable Subordination)**
**(As Against LNV)**

115.    Debtor-plaintiff White Eagle incorporates Paragraphs 1 through 114 as if fully set forth herein.

116.    Section 510(c) of the Bankruptcy Code authorizes the Court to subordinate claims under principles of equitable subordination.

117.    Due to its control over White Eagle and its operations, LNV is an "insider" under Section 101 of the Bankruptcy Code.

118.    LNV engaged in inequitable, unconscionable, and/or unfair conduct.

119.    Among other things, LNV's bad faith, abuse of its control over White Eagle, and other misconduct so deprived White Eagle of cash that it was forced to file this bankruptcy case. At all times, this outcome was LNV's primary objective, as LNV believed it could utilize this bankruptcy proceeding to expropriate White Eagle's assets for itself at below-market prices, to the detriment of White Eagle and its other stakeholders.

120.    This inequitable, unconscionable, and/or unfair conduct of LNV resulted in harm to White Eagle, its creditors and its other stakeholders, and/or gave LNV an unfair advantage over White Eagle's other creditors.

121.    LNV's inequitable conduct was directed against White Eagle and its other stakeholders.  Subordination of LNV's claims and equity interests is necessary to offset the harm which White Eagle and its creditors suffered on account of LNV's inequitable conduct, which led directly to the debtors' bankruptcy filing in the first place.

122.    All or portions of LNV's claims should be equitably subordinated.  Specifically, the LNV 45% Equity Position should be subordinated to all other equity interests in White Eagle; the remainder of LNV's claims should be subordinated to all other claims against White Eagle; and, pursuant to Section 510(c)(2) of the Bankruptcy Code, any and all liens securing LNV's equitably subordinated claims should be transferred to the White Eagle estate.

## PRAYER FOR RELIEF

**WHEREFORE**, White Eagle respectfully requests that this Court enter judgment against Defendants, and provide the following relief:

    (a)    Actual, indirect, economic, consequential and compensatory damages in an amount to be determined at trial;

    (b)    An order requiring LNV to perform its obligations under the Loan Agreement by calculating the Lender Valuation and the LTV reasonably and in good faith;

    (c)    A judgment declaring that the LNV 45% Equity Position constitutes an equity interest in White Eagle that ranks below the claims of White Eagle's creditors;

    (d)    A judgment declaring that the LNV 45% Equity Position constituted original issue discount (OID), and that any portion of such OID that is unamortized or unmatured as of the effective date of a plan for White Eagle must be deducted from the face amount of the note to LNV, and disallowed, in determining the allowed amount of LNV's claim;

    (e)    In the alternative to "(c)" and "(d)", a judgment declaring that the LNV 45% Equity Interest constitutes interest on LNV's Loan, and that any portion of the LNV 45% Equity Position that is accrued or payable after White Eagle's Effective Date must be disallowed;

    (f)    A judgment (x) subordinating all of LNV's claims against White Eagle except the LNV 45% Equity Interest to all other claims against White Eagle; (y) subordinating the LNV 45% Equity Interest to all claims against and interests in White Eagle, including the interests of White Eagle's other

equityholders; and (z) transferring to the White Eagle estate any and all liens securing LNV's equitably subordinated claims;

(g)    Punitive and/or exemplary damages;

(h)    All costs of suit, including reasonable and necessary attorney's fees;

(i)    Pre- and post-judgment interest at the maximum rate allowed by law; and

(j)    All such further relief, both general and special, at law or in equity, to which plaintiffs may show themselves justly to be entitled or as this Court may deem appropriate.

Dated: January 25, 2019
      Wilmington, Delaware

KASOWITZ BENSON TORRES LLP
Marc E. Kasowitz
Sheron Korpus
Gavin D. Schryver
Alycia Regan Benenati
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile:  (212) 506-1800
Email:        mkasowitz@kasowitz.com
            skorpus@kasowitz.com
            gschryver@kasowitz.com
            abenenati@kasowitz.com

*Proposed Special Litigation Counsel for the Debtor-Plaintiffs and Plaintiff Emergent Capital, Inc.*

– and –

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Colin R. Robinson*
Richard M. Pachulski (CA Bar No. 62337)
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Maxim B. Litvak (CA Bar No. 215852)
Colin R. Robinson (DE Bar No. 5524)
919 North Market Street, 17th Floor
P.O. Box. 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:        rpachulski@pszjlaw.com
            jpomerantz@pszjlaw.com
            ikharasch@pszjlaw.com
            mlitvak@pszjlaw.com
            crobinson@pszjlaw.com

*Attorneys for the Debtor-Plaintiffs*