## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>WHITE EAGLE ASSET PORTFOLIO, LP,<br>WHITE EAGLE GENERAL PARTNER, LLC,<br>and LAMINGTON ROAD DESIGNATED<br>ACTIVITY COMPANY (f/k/a LAMINGTON<br>ROAD LIMITED),<br><br>Debtors. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Chapter 11<br><br>Case No. 18-12808 (KG)<br><br>(Jointly Administered) |
| EMERGENT CAPITAL, INC., WHITE<br>EAGLE ASSET PORTFOLIO, LP, WHITE<br>EAGLE GENERAL PARTNER, LLC, and<br>LAMINGTON ROAD DESIGNATED<br>ACTIVITY COMPANY (f/k/a LAMINGTON<br>ROAD LIMITED),<br><br>Plaintiffs,<br><br>v.<br><br>LNV CORPORATION, SILVER POINT<br>CAPITAL L.P., and GWG HOLDINGS, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Adv. Proc. No. 19-50096 (KG)<br><br>**Re:  D.I. 58** |

## MEMORANDUM OF LAW IN SUPPORT OF LNV CORPORATION'S MOTION TO DISMISS AMENDED ADVERSARY COMPLAINT

Dated:  April 17, 2019

Jeffrey M. Schlerf (No. 3047)
Carl D. Neff (No. 4895)
**FOX ROTHSCHILD LLP**
919 North Market St., Suite 300
Wilmington, DE 19801
Telephone: (302) 654-7444
Facsimile: (302) 463-4971
jschlerf@foxrothschild.com
cneff@foxrothschild.com

Thomas E Lauria (admitted *pro hac vice*)
**WHITE & CASE LLP**
Southeast Financial Center
200 S. Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
tlauria@whitecase.com

–and–

David M. Turetsky (admitted *pro hac vice*)
Andrew T. Zatz (admitted *pro hac vice*)
Kimberly A. Haviv (admitted *pro hac vice*)
Samuel P. Hershey (admitted *pro hac vice*)
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, NY 10020-1095
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
dturetsky@whitecase.com
azatz@whitecase.com
kim.haviv@whitecase.com
sam.hershey@whitecase.com

–and–

Jason N. Zakia (admitted *pro hac vice*)
**WHITE & CASE LLP**
227 West Monroe Street, Suite 3900
Chicago, IL 60606-5055
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
jzakia@whitecase.com

*Attorneys for CLMG Corp.*
*and LNV Corporation*

ii

## Table of Contents

NATURE AND STAGE OF PROCEEDINGS ............................................................ 1

SUMMARY OF ARGUMENT ............................................................................... 1

BACKGROUND AND RELEVANT FACTS ............................................................ 5

   I.   The Uneven And Unpredictable Life Settlement Industry ................................ 5

   II.   The Operative Loan Agreement That White Eagle Sought And Bargained For ............... 6

      A.   The LTV Ratio And Related Waterfall ........................................................... 7

      B.   LNV's Participation Interest ............................................................................ 9

      C.   The Up-Front Fee ........................................................................................... 10

      D.   Other Relevant Sections Of The Loan Agreement ..................................... 10

   III.   Silver Point And GWG Unsuccessfully Bid For White Eagle's Assets .................. 11

   IV.   The Debtors File For Bankruptcy And Plaintiffs Bring This Action ................... 11

LEGAL STANDARD ......................................................................................... 12

ARGUMENT ..................................................................................................... 13

   I.   Plaintiffs Have Not Pled A Breach Of The Loan Agreement (Count I) ................ 13

      A.   Plaintiffs Fail To Plead Sufficient Facts To State A Claim For Breach .......... 14

      B.   Plaintiffs Fail To Show That Any Valuations Relied On By LNV Were Arbitrary Or Irrational ......................................................................................... 16

      C.   Plaintiffs Fail To State A Claim Based On Policies That Have Matured .......... 17

   II.   Plaintiffs Have Not Stated A Claim For Breach Of The Covenant Of Good Faith And Fair Dealing (Count II) .................................................................................. 18

   III.   Plaintiffs' Claim For Breach of Fiduciary Duty Must Be Dismissed (Count IV) ....... 21

      A.   The Loan Agreement Obligations, Including The Participation Interest, Are Debt ..... 22

      B.   The Loan Agreement Expressly Precludes A Joint Venture ...................... 22

      C.   LNV Does Not Share Losses, Precluding A Joint Venture ......................... 23

      D.   Plaintiffs Have Not Pled A Breach Of Fiduciary Duty ............................... 25

   IV.   Plaintiffs Cannot State A Claim For Civil Conspiracy (Count VI) .................. 25

   V.   Emergent Has No Standing To Bring Any Claims ....................................... 28

   VI.   Plaintiffs' Attempt To Recharacterize The Participation Interest As "Unmatured Interest" Fails (Count VII) ............................................................................... 29

      A.   The Participation Interest Is Not "Interest" ................................................. 30

      B.   The Participation Interest Is Not Unmatured .............................................. 32

      C.   White Eagle Should Not Be Permitted To Use Section 502(b)(2) To Avoid Its Contractual Obligations, Including The Participation Interest ....................... 35

iii

VII.    The Recharacterization Claim Should Be Dismissed (Count VIII)............................. 37

A.    The Loan Agreement Is A Debt Transaction That Must Be Considered In Its Entirety.................................................................................................................... 37

B.    The Participation Interest Is Not Equity ......................................................... 37

C.    Recharacterization Is Improper In A Solvent Debtor Case ........................................ 39

VIII.    Plaintiffs' Request For A Declaratory Judgment That The Participation Interest Resulted In OID Must be Dismissed (Count IX)........................................................ 40

A.    Because The Face Amount Of The Loan Agreement Was Fully Funded, There Is No OID................................................................................................................... 40

B.    Plaintiffs Cannot Isolate The Participation Interest To Create OID ............................ 41

C.    The Court Should Reject Plaintiffs' Effort To Expand The OID Doctrine .................. 42

IX.    Plaintiffs' Request For A Declaratory Judgment That The Up-Front Fee Resulted In OID Must Be Dismissed (Count X)........................................................................ 43

X.    LNV Should Not Be Equitably Subordinated (Count XI) ............................................. 44

A.    There Is No Egregious, Conscience-Shocking Conduct Here ..................................... 45

B.    LNV's Claim Cannot Be Subordinated To Unsecured Claims ................................... 46

C.    LNV's Participation Interest Cannot Be Subordinated To Emergent's Equity ........... 47

XI.    White Eagle Executed Releases That Bar Its Claims To Recharacterize And Negate The Participation Interest And The Up-Front Fee .................................................... 48

XII.    The Complaint Should Be Dismissed With Prejudice ................................................. 50

CONCLUSION............................................................................................................. 50

iv

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*19 Recordings Ltd. v. Sony Music Entm't*, 97 F. Supp. 3d 433 (S.D.N.Y. 2015)....................18-19

*Adelphia Recovery Tr. v. Bank of Am., N.A.*, 390 B.R. 80 (S.D.N.Y. 2008) ................................47

*Alexander & Alexander, Inc. v. Fritzen*, 68 N.Y.2d 968 (1986)....................................................25

*Arm Real Estate Grp., LLC v. Dalan Mgmt.*, No. 158967/2015, 2016 N.Y. Misc.
    LEXIS 2322 (Sup. Ct. N.Y. Cty. June 8, 2016)...............................................................26-27

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................................12, 13

*Atrium View, LLC v. E. Sav. Bank, FSB (In re Atrium View, LLC)*, No. 07-02478
    (MDF), 2008 Bankr. LEXIS 3441 (Bankr. M.D. Pa. Dec. 24, 2008).....................................30

*Awards.com v. Kinko's, Inc.*, 42 A.D.3d 178 (1st Dep't 2007) .....................................................22

*Azuma N.V. v. Sinks*, 646 F. Supp. 122 (S.D.N.Y. 1986) .............................................................20

*Baidu, Inc. v. Register.com, Inc.*, 760 F. Supp. 2d 312 (S.D.N.Y. 2010) ......................................49

*Bailey v. Harrington*, 462 So. 2d 861 (Fla. Dist. Ct. App. 1985) .................................................32

*Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726 (6th
    Cir. 2001) ...............................................................................................................................38

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................................13

*Bereswill v. Yablon*, 6 N.Y.2d 301, 189 N.Y.S.2d 661, 160 N.E.2d 531 (1959).........................26

*Beskrone v. OpenGate Capital Grp. (In re Pennysaver USA Publ'g, LLC)*, 587
    B.R. 445 (Bankr. D. Del. 2018) .............................................................................................13

*Bird v. SKR Credit, Ltd. (In re Digital bridge Holdings, Inc.)*, No. 10-34499, 2015
    Bankr. LEXIS 3314 (Bankr. D. Utah Sept. 30, 2015) .............................................................47

*Blue Citi, LLC v. 5Barz Int'l Inc.*, 338 F. Supp. 3d 326 (S.D.N.Y. 2018)....................................32

*Branisteanu v. TM Sys., Inc.*, No. 90-cv-5149 (PNL), 1992 U.S. Dist. LEXIS 4824
    (S.D.N.Y. Apr. 10, 1992).......................................................................................................23

*Britton v. Diprima*, 71 A.D.3d 1560 (4th Dep't 2010) .................................................................29

v

*Bronx Legal Servs. v. Legal Servs.*, No. 02-cv-6199 (GBD), 2003 U.S. Dist. LEXIS 695 (S.D.N.Y. January 17, 2003) ...............................................................23

*Brookview Apts., L.L.C. v. Hoer (In re Weigh)*, 576 B.R. 189 (Bankr. C.D. Cal. 2017) ..............................................................................................................49

*Brown v. Hiatts*, 82 U.S. 177 (1872)........................................................................31

*Canstar v. J.A. Jones Constr. Co.*, 212 A.D.2d 452 (1st Dep't 1995)........................19

*Carolina Shores, LLC v. Dixon (In re Daufuskie Island Props., LLC)*, 431 B.R. 649 (Bankr. D. S.C. 2010) ....................................................................37

*Christie's Inc. v. Davis*, 247 F. Supp. 2d 414 (S.D.N.Y. 2002).........................15, 17

*Clark v. Allen & Overy LLP*, No. 453138/2017, 2019 N.Y. Misc. LEXIS 251 (Sup. Ct. N.Y. Cty. Jan. 16, 2019) ...............................................................26

*Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448 (3d Cir. 2006) ...........................................................................................38, 46

*Consol. Rock Prods. Co. v. Du Bois*, 312 U.S. 510 (1941) .......................................36

*Corris v. White*, 29 A.D.2d 470 (4th Dep't 1968) ....................................................27

*CSC Tr. Co. v. Energy Future Intermediate Holdings Co. LLC (In re Energy Future Holdings Corp.)*, 513 B.R. 651 (Bankr. D. Del. 2014) ............................ 30, 34, 35-36

*De Vito v. Pokoik*, 150 A.D.2d 331 (2d Dep't 1989).................................................24

*Del. Tr. Co. v. Energy Future Intermediate Holding Co. LLC (In re Energy Future Holdings Corp.)*, 842 F.3d 247 (3d Cir. 2016) .........................................30

*Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64 (2d Cir. 2003)................................23

*Doe v. Nat'l Bd. Of Podiatric Med. Exam'rs*, No. 03-cv-4034 (RWS), 2005 U.S. Dist. LEXIS 2021 (S.D.N.Y. Feb. 18, 2005) ................................................ 13-14

*Dormitory Auth. of the State of N.Y. v. Samson Constr. Co.*, 30 N.Y.3d 704 (2018).............. 28-29

*Fairchild Dornier GmbH v. Official Comm. of Unsecured Creditors (In re Dornier Aviation (N. Am.), Inc.)*, 453 F.3d 225 (4th Cir. 2006).............................38

*FCOF UB Secs. LLC v. Morequity, Inc.*, 663 F. Supp. 2d 224 (S.D.N.Y. 2009) .........................18

*Fin Hay Realty Co. v. U.S.*, 398 F.2d 694 (3d Cir. 1968)........................................38

*Finley v. Giacobbe*, 79 F.3d 1285 (2d Cir. 1996) ....................................................26

vi

*First State Orthopaedics, P.A. v. Gallagher Bassett Servs, Inc.*, No. N17C-06-320 (WCC), 2018 Del. Super. LEXIS 204 (Del. Sup. Ct. New Castle May 3, 2018) ...................24

*Fox Sports Net West 2, LLC v. L.A. Dodgers LLC (In re L.A. Dodgers LLC)*, 465 B.R. 18 (D. Del. 2011) ...........................................................................................35

*Galvstar Holdings, LLC v. Harvard Steel Sales, LLC*, 722 Fed. App'x 12 (2d Cir. 2018) ................................................................................................................21, 22, 23

*Gen. Motors Corp. v. Dealmaker*, No. 07-cv-141 (TJM), 2009 U.S. Dist. LEXIS 39278 (N.D.N.Y. May 8, 2009) ................................................................. 14-15, 16

*Gillman v. Chase Manhattan Bank*, 73 N.Y.2d 1 (1988) ..........................................13

*Goureau v. Goureau*, No. 12 Civ. 6443 (PAE), 2013 U.S. Dist. LEXIS 14929 (S.D.N.Y. Feb. 4, 2013) ....................................................................................21

*Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729 (2d Cir. 1984) .........13

*Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, 331 F. Supp. 3d 221 (S.D.N.Y. 2018) ...........................................................................................26, 27

*Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73 (2d Cir. 2002) ..................18

*Highland Constr. Mgmt. Servs., LP v. Wells Fargo (In re Highland Constr. Mgmt. Servs.)*, 569 B.R. 673 (E.D. Va. 2017) ...............................................................49

*In re Allegheny Int'l, Inc.*, 100 B.R. 247 (Bankr. W.D. Pa. 1989) ..............................41

*In re Alves*, No. 05-22840, 2007 Bankr. LEXIS 1843 (Bankr. W.D.N.Y. May 25, 2007) .............................................................................................................33

*In re Auto Specialties Mfg. Co.*, 153 B.R. 457 (Bankr. W.D. Mich. 1993) ..................44

*In re Chateaugay Corp.*, 961 F.2d 378 (2d Cir. 1992) .....................................40, 42, 43

*In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566 (7th Cir. 1992) ...........................................31

*In re Exide*, 299 B.R. 732 (Bankr. D. Del. 2003) .......................................................37

*In re Graboyes*, 371 B.R. 113 (Bankr. E.D. Pa. 2007) ...............................................30

*In re Hercules Offshore, Inc.*, 565 B.R. 732 (Bankr. D. Del. 2016) .............................48

*In re Holm*, 931 F.2d 620 (9th Cir. 1991) .................................................................33

*In re M. Paolella & Sons, Inc.*, No. 86-00495F, 1991 Bankr. LEXIS 1181 (Bankr. E.D. Pa. Apr. 15, 1991) ....................................................................................36

*In re McMurray*, 218 B.R. 867 (Bankr. E.D. Tenn. 1998) ............................................................33

*In re Moore*, 307 B.R. 394 (Bankr. S.D.N.Y. 2004)....................................................................33

*In re Oakwood Homes Corp.*, 449 F.3d 588 (3d Cir. 2006) ........................................................42

*In re Pengo Indus., Inc.*, 962 F.2d 543 (5th Cir. 1992) ................................................................42

*In re Pinetree Partners, Ltd.,* 87 B.R. 481 (Bankr. N.D. Ohio 1988) ..........................................45

*In re Ryker*, No. 06-1872, 2007 U.S. App. LEXIS 17993 (3d Cir. July 26, 2007).......................30

*In re Sch. Speciality, Inc.*, No. 13-10125, 2013 Bankr. LEXIS 1897 (Bankr. D. Del. Apr. 22, 2013) ................................................................................................30

*Interpharm, Inc. v. Wells Fargo Bank, N.A.*, 655 F.3d 136 (2d Cir. 2011) .......................14, 15, 18

*Iqbal v. Hasty*, 490 F.3d 143 (2d Cir. 2007) ................................................................................28

*JLL Consultants, Inc. v. Hormel Foods Corp. (In re AgFeed USA, LLC)*, 2015 Bankr. LEXIS 4272 (Bankr. D. Del. Dec. 15, 2015)................................................49

*Kalisch v. Maple Trade Fin. Co. (In re Kalisch)*, 413 B.R. 115 (Bankr. S.D.N.Y. 2008) ........................................................................................................................ 46-47

*Kidz Cloz, Inc. v. Officially for Kids, Inc.*, 320 F. Supp. 2d 164 (S.D.N.Y. 2004).......................21

*Lawsky v. Condor Capital Corp.*, 154 F. Supp. 3d 9 (S.D.N.Y. 2015) ........................................25

*Lehman Bros. Special Fin. v. Bank of Am. N.A. (In re Lehman Bros. Holdings)*, 553 B.R. 476 (Bankr. S.D.N.Y. 2016) .....................................................................34

*Madison 92nd St. Assoc., LLC v. Courtyard Mgmt. Corp.*, No. 653449/2015 (EB), 2016 N.Y. Misc. LEXIS 4272 (Sup. Ct. N.Y. Cty. 2016) ......................................18

*Mirant Mid-Atl., LLC v. Morgantown OL1 LLC (In re Mirant Corp.)*, 327 B.R. 262 (Bankr. N.D. Tex. 2005) ......................................................................... 39-40

*Morgan Stanley & Co. v. Peak Ridge Master SPC Ltd.*, 930 F. Supp. 2d 532 (S.D.N.Y. 2013)...............................................................................................18

*Naqvi v. Comput. Assocs. Int'l, Inc.*, No. 100875/06, 2012 N.Y. Misc. LEXIS 6319 (Sup. Ct. N.Y. Cty. Mar. 23, 2012)................................................................... 22-23

*Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.)*, 361 B.R. 369 (Bankr. S.D.N.Y. 2007) ...........................................................................................49

AMERICAS 99615981

*Noonan v. Fremont Fin. (In re Lappin Elec. Co.),* 245 B.R. 326, 330 (Bankr. E.D. Wis. 2000)..................................................................................................31

*Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S&B Holdings LLC)*, 420 B.R. 112 (Bankr. S.D.N.Y. 2009) ..................................37

*Official Comm. of Unsecured Creditors of Champion Enters. v. Credit Suisse (In re Champion Enters.)*, No. 10-50514 (KG), 2010 Bankr. LEXIS 2720 (Bankr. D. Del. Sept. 1, 2010) ..........................................................................................49

*Official Comm. of Unsecured Creditors of Champion Enters. v. Credit Suisse (In re Champion Enters.),* Adv. Pro. No. 10-50514 (KG), 2012 Bankr. LEXIS 4009 (Bankr. D. Del. Aug. 30, 2012)............................................................... 44-45

*Official Comm. of Unsecured Creditors of Fedders N. Am. Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527 (Bankr. D. Del. 2009) ....................................................................................................45, 46

*Official Comm. of Unsecured Creditors of HH Liquidation, LLC v. Comvest Grp. Holdings, LLC (In re HH Liquidation, LLC)*, 590 B.R. 211 (Bankr. D. Del. 2018) .......................................................................................... 38, 44, 47-48

*Official Comm. of Unsecured Creditors v. Dow Chem. Corp. (In re Dow Corning Corp.)*, 456 F.3d 668 (6th Cir. 2005).....................................................................36

*Official Comm. of Unsecured Creditors v. UMB Bank, N.A. (In re Residential Capital)*, 501 B.R. 549 (Bankr. S.D.N.Y. 2013).....................................32-33, 42-43

*PAH Litig. Tr. v. Water St. Healthcare Partners L.P. (In re Physiotherapy Holdings, Inc.),* 2016 Bankr. LEXIS 2810 (Bankr. D. Del. June 20, 2016)...........................49

*Perlmutter v. Salton, Inc.*, No. 09-690-GMS, 2010 U.S. Dist. LEXIS 100659 (D. Del. Sept. 24, 2010) .....................................................................................................50

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC),* 515 B.R. 117 (Bankr. S.D.N.Y. 2014) ..........................................................................................48

*Pitcairn Props. v. LJL 33rd St. Assocs., LLC*, No. 11 Civ. 7318 (JSR), 2012 U.S. Dist. LEXIS 173881 (S.D.N.Y. Nov. 19, 2012) .......................................................20

*Premier Entm't Biloxi LLC v. U.S. Bank Nat'l Assoc. (In re Premier Entm't Biloxi LLC)*, 445 B.R. 582 (Bankr. S.D. Miss. 2010) .........................................................36

*Ray Legal Consulting Grp. v. Dijoseph*, 37 F. Supp. 3d 704 (S.D.N.Y. 2014)............................25

*Ritchie Capital Mgmt., L.L.C. v. Coventry First LLC*, No. 07-cv-3494 (DLC), 2007 U.S. Dist. LEXIS 51081 (S.D.N.Y. July 17, 2007) .......................................................23

ix

*Roberts v. 112 Duane Assocs. LLC*, 32 A.D.3d 366 (1st Dep't 2006) ..........................................24

*Schmidt v. Skolas*, 770 F.3d 241 (3d Cir. 2014) ...........................................................................6

*Sharp Int'l Corp. v. State St. Bank & Tr. Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43 (2d Cir. 2005)...............................................................................................................22

*Shubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382 (3d Cir. 2009) ......................................................................................................................47

*Slabakis v. Schik*, 164 A.D.3d 454 (1st Dep't 2018) ............................................................. 23-24

*Slip-N-Slide Records, Inc. v. Island Def Jam Music Group*, No. 13-cv-04450 (ALC), 2014 U.S. Dist. LEXIS 70186 (S.D.N.Y. May 21, 2014).............................. 23, 24-25

*Solutia Inc. v. FMC Corp.*, 385 F. Supp. 2d 324 (S.D.N.Y. 2005)..............................................29

*Steinbeck v. Gerosa*, 4 N.Y.2d 302 (1958) ...............................................................................23

*The Holders of Class C Common Stock of Rimsat, Ltd. v. Kauthar Sdn Bhd (In re Rimsat, Ltd.)*, 229 B.R. 910 (Bankr. N.D. Ind. 1998)..............................................................47

*Thome v. Alexander & Louisa Calder Found.*, 70 A.D.3d 88 (1st Dep't 2009)...........................25

*Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039 (9th Cir. 2002) ...............................................................................................................35, 43

*Thyssenkrupp Elevator Corp. v. Gristedes's Foods, Inc.* No. 60169314, 2006 N.Y. Misc. LEXIS 9338 (Sup. Ct. N.Y. Cty. Feb. 27, 2006) ...........................................34

*Tolliver v. Trinity Par. Found.*, No. 14-1021 (LPS) 2017 U.S. Dist. LEXIS 121764 (D. Del. Aug. 2, 2017) ...............................................................................26

*Tracinda Corp. v. DaimlerChrysler AG (In re DaimlerChrysler AG Sec. Litig.)*, 197 F. Supp. 2d 42 (D. Del. 2002)...........................................................................26

*Transit Funding Assocs., LLC v. Capital One Equip. Fin. Corp.*, 149 A.D.3d 23 (1st Dep't 2017) .............................................................................................. 19-20

*Travelers Cas. & Sur. Co. of Am. v. PG&E Co.*, 549 U.S. 443 (2007) .......................................29

*U.S. Bank Tr. Nat'l Ass'n v. AMR Corp. (In re AMR Corp.)*, 730 F.3d 88 (2d Cir. 2013) .......................................................................................................................34

*U.S. v. Ron Pair Enters.*, 489 U.S. 235 (1989) .........................................................................30

*UPS Capital Bus. Credit v. Gencarelli (In re Gencarelli)*, 501 F.3d 1 (1st Cir. 2007) .......................................................................................................................36

x

*Veleron Holding, B.V. v. BNP Paribas SA*, No. 12 Civ. 5966 (CM), 2014 U.S. Dist. LEXIS 199357 (S.D.N.Y. Apr. 16, 2014)........................................................29

*Veneto Hotel & Casino, S.A. v. German Am. Capital Corp.*, 160 A.D.3d 451 (1st Dep't 2018) ...............................................................................................................20

*Villarreal v. Showalter (In re Villarreal)*, 413 B.R. 633 (Bankr. S.D. Tex. 2009).......................36

*Waslow v. MNC Commercial Corp. (In re Paolella)*, 161 B.R. 107 (E.D. Pa. 1993) ........................................................................................................................45, 46

*Winshall v. Viacom Int'l Inc.*, 76 A.3d 808 (Del. 2013) .................................................6

*Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d 490 (S.D.N.Y. 2002) ...........................21

*Youkelsone v. In re Wash. Mut. Inc. (In re Wash. Mut. Inc.)*, 741 F. App'x 88 (3d Cir. 2018) .......................................................................................................... 12-13

## STATUTES AND RULES

11 U.S.C. § 101..........................................................................................................29

11 U.S.C. § 363..........................................................................................................36

11 U.S.C. § 365..........................................................................................................34

11 U.S.C. § 502 .................................................................................................. passim

11 U.S.C. § 506..........................................................................................................44

11 U.S.C. § 725..........................................................................................................36

## MISCELLANEOUS

Fed. Bankr. Civ. Pro. 7012 .........................................................................................1

Fed. Bankr. Civ. Pro. 12(b)(6) .................................................................................37

H.R. Rep. No. 595, 95th Cong., 1st Sess. 352-53 (1977) ................................. 33, 40-41

AMERICAS 99615981

## NATURE AND STAGE OF PROCEEDINGS

Defendant LNV Corporation ("LNV") submits this memorandum of law in support of its motion (the "Motion")[1] for entry of an order (the "Order") dismissing the amended adversary complaint [D.I. 48] (the "Complaint") filed by Emergent Capital, Inc. ("Emergent"), White Eagle Asset Portfolio, LP ("White Eagle"), White Eagle General Partner, LLC ("White Eagle GP"), and Lamington Road Designated Activity Company (f/k/a Lamington Road Limited) ("Lamington Road" and collectively, "Plaintiffs").  LNV relies on and incorporates by reference the *Declaration of Samuel P. Hershey in Support of LNV Corporation's Motion to Dismiss Amended Adversary Complaint* (the "Hershey Declaration"), filed concurrently herewith, and respectfully states as follows:

## SUMMARY OF ARGUMENT

In 2012, Plaintiffs needed a loan to "assist the company's liquidity," which White Eagle ultimately obtained from LNV.  A few years later, in 2016, Plaintiffs badly needed cash and returned to LNV in the hope of amending the parties' loan agreement to secure additional funds. After extensive negotiation by the parties and their counsel, White Eagle agreed to each of the terms at issue here in exchange for LNV extending, and later increasing, its credit facility.

Emergent was acquired in July 2017 and, since then, Plaintiffs have been trying to get out of the promises they made to LNV.  The Complaint is the culmination of those efforts—a transparent attempt by Emergent's new owners to nullify protections for LNV that White Eagle willingly gave at the loan's inception and when it needed LNV to increase its credit facility. Throughout the Complaint, Plaintiffs ask the Court to rewrite and recharacterize one express contractual provision after another—often in contradictory ways—so as to completely re-trade

---

[1]   Per Bankruptcy Rule 7012, LNV consents to entry of a final judgment by this Court.

the parties' deal for Emergent's benefit.  But there is no legal or equitable basis to upend the specific compromises and allocations of risk set forth in writing by these sophisticated parties, all of which Emergent's new owners had access to when they bought their interest in Emergent. Plaintiffs should be held to their bargain, and the Complaint should be dismissed in its entirety.

*First*, Plaintiffs' breach of contract claim fails.  That claim narrowly targets one aspect of the Second Amended and Restated Loan and Security Agreement, dated as of January 31, 2017 (as amended, restated, supplemented or otherwise modified, the "Loan Agreement"): White Eagle's agreement that its cash flows would go to repaying LNV, and not be distributed to White Eagle to be dividended to Emergent, unless and until the ratio of the loan amounts outstanding to the value of the life settlements portfolio securing the loan fell below 65%.  As Plaintiffs readily concede, the value of the life settlements portfolio is both variable and volatile, and requires "[c]onsiderable judgment" to assess.[2]  The parties specifically agreed to give LNV the discretion to set this value.

Under New York law, Plaintiffs must plead facts showing that LNV's exercise of its discretion in valuing the portfolio was arbitrary or irrational to state a claim for breach.  The Complaint is bereft of such facts.  Notably, Plaintiffs do not state which valuations they are challenging, what they think those valuations should have been or why.  Moreover, the Loan Agreement stipulates certain valuation methods that are "deemed" reasonable, and Plaintiffs do not (and cannot) allege that those methods were not followed.

To the contrary, Plaintiffs allege that, in accordance with the Loan Agreement, LNV used third parties to value the life settlement portfolio: D3G Capital, LLC ("D3G"), which was expressly appointed for various responsibilities under the Loan Agreement (and has performed

---

[2]   Emergent Capital, Inc., Quarterly Report (Form 10-Q), at 30 (Apr. 10, 2019).

from the facility's inception without issue), in conjunction with Lewis & Ellis, which White Eagle describes as its own valuation expert.  Plaintiffs make the conclusory claim that valuations provided to LNV were, at unspecified times, different from other valuations that Plaintiffs had secured from Lewis & Ellis.  Plaintiffs never identify either the valuations they challenge or the supposedly different valuations they separately received.  Even accepting these generalized allegations as true, the existence of different conclusions on a complex valuation, standing alone, does not amount to an abuse of contractual discretion to set value.  Plaintiffs' invocation of "tens of millions of dollars" difference amounts to a few percentage points on a portfolio worth half a billion dollars by Plaintiffs' own math.  This does not state a plausible claim.

*Second*, Plaintiffs cannot state a claim for breach of the implied covenant of good faith and fair dealing.  Many of the allegations in support of this claim are barred as duplicative of the breach of contract claim, and all are barred by the express terms of the Loan Agreement.

*Third*, Plaintiffs seek to transform the Loan Agreement—a negotiated secured lending transaction—into a purported joint venture imposing fiduciary duties on LNV.  The Loan Agreement expressly provides that it does not (i) "constitute a . . . joint venture," (ii) "create an agency or fiduciary relationship," or (iii) make LNV "in any way [] responsible or liable for the debts, losses, obligations or duties" of White Eagle.  Loan Agreement § 13.14.  These terms preclude a joint venture as a matter of law.  And case law confirms that, even with some measure of shared cash flows, there can be no joint venture without loss-sharing, which is absent here.

*Fourth*, Plaintiffs' civil conspiracy claim fails because Plaintiffs have failed to plead any underlying tort or alleged injury.  Nor do any facts asserted in the Complaint—which amount to alleged communications between current and former employees of Defendants during Silver Point's and GWG's competing proposals to purchase the White Eagle portfolio—come close to

plausibly alleging an actionable conspiracy.

*Fifth*, Plaintiffs' request for a declaratory judgment that a portion of the Participation Interest should be disallowed as unmatured post-effective date interest must fail. The Participation Interest is neither interest nor unmatured. It is not treated as interest under the Loan Agreement, it is not linked to the principal amount of the loan and it survives the loan's maturity and repayment. Further, White Eagle's obligation to pay the Participation Interest was fully earned by LNV at the inception of the Initial Loan Agreement and was accelerated when White Eagle's limited partner and general partner filed chapter 11 cases roughly a month before White Eagle. Moreover, the Debtors claim to be solvent.[3] Plaintiffs should not be able to obtain the perverse result of reducing the claim of a secured creditor that would obtain a full recovery in a chapter 7 liquidation and thereby provide a windfall to equity.

*Sixth*, Plaintiffs' request to recharacterize the Participation Interest as equity should be rejected. Plaintiffs cannot sever the Participation Interest from the broader transaction, which is plainly a loan. Further, the Participation Interest lacks fundamental hallmarks of equity ownership, and LNV's transaction with White Eagle was simply not equity in disguise.

*Seventh*, Plaintiffs' claim for a declaratory judgment disallowing a portion of LNV's claim as original issue discount ("OID") based on the Participation Interest fails. LNV has extended the full amount of the loan with no discount, and LNV is unaware of any case in which a bankruptcy court treated fully-funded debt as OID. The unprecedented step urged by Plaintiffs would punish LNV for providing needed financing to White Eagle and disincentivize other institutions from doing the same.

*Eighth*, Plaintiffs' claim for a declaratory judgment disallowing as OID the $4 million

---

[3] LNV reserves all rights to challenge the Debtors' allegation of solvency, but presumes the allegation of solvency to be true for purposes of this Motion, as required.

"Up-Front Fee" under the Loan Agreement should be denied for the same reasons.  The Up-Front Fee was fully earned and paid, and the fact that LNV's funding of the initial draw under the Loan Agreement was, for administrative convenience, offset by White Eagle's obligation to pay the Up-Front Fee does not transform the Up-Front Fee into OID.

*Ninth*, Plaintiffs' claims for equitable subordination should be rejected.  Plaintiffs have failed to allege any wrongdoing by LNV (which enforced its express contractual rights), let alone the level of extraordinary and egregious conduct required to equitably subordinate the claim of a secured lender.

*Tenth*, White Eagle signed comprehensive releases of any claims pertaining to the Loan Agreement, which bar its requests for declaratory judgments challenging, recharacterizing and otherwise disallowing the Participation Interest and the Up-Front Fee.  Additionally, Emergent, a non-Debtor and non-party to the Loan Agreement, lacks standing to bring any claim here.

For these reasons, Plaintiffs' Complaint should be dismissed in its entirety.

## BACKGROUND AND RELEVANT FACTS

### I.    The Uneven And Unpredictable Life Settlement Industry

The life settlement industry in which Plaintiffs operate is inherently risky.  Complaint ¶ 21.  As Plaintiffs explain in the Complaint, in a life settlement transaction, an investor like White Eagle purchases and holds life insurance policies.  *Id.*  ¶¶ 19-20.  The investor pays all premiums and fees, and receives the policies' death benefits when they pay out.  *Id.* ¶ 19.  The timing of the death benefit payments are variable and unpredictable.  Investors need cash to service the policies and pay premiums and, as a result, can suffer "liquidity issues if the benefit payouts received are insufficient to cover the cash outlays."  *Id.* ¶ 21.  If the purchase price, premiums, and fees become greater than the death benefits under the policy, the investor suffers a compounding loss.  *Id.*  In addition, insurance companies can and do contest their obligation to

pay death benefits, which can result in expensive litigation, delayed repayment and the risk that proceeds will not be paid at all. *See id.* ¶¶ 29, 40, 65.

For all these reasons, and as Plaintiffs acknowledge, life settlement assets—LNV's security for the Loan Agreement—are "subject to uneven cash flows that can be difficult to predict." *Id.* ¶ 21. This uncertainty is exacerbated by changing external metrics for valuing life settlement assets, such as the updated life expectancy tables released in October and November 2018 referenced in the Complaint. *Id.* ¶ 57.

## II.   The Operative Loan Agreement That White Eagle Sought And Bargained For

White Eagle is a special purpose entity that owns a portfolio of 594 life insurance policies. *Id.* ¶ 22. Plaintiffs plead that these policies have an aggregate death benefit of approximately $2.8 billion and a combined fair value, as calculated by LNV in October 2018, of approximately $552 million. *Id.* The other Plaintiffs are holding companies for White Eagle, with Plaintiff Emergent as the ultimate parent (and sole non-Debtor). *Id.* ¶¶ 9-11, 23.

The Loan Agreement at the center of this controversy is this loan's latest iteration. *Id.* ¶¶ 25, 31.[4] The parties entered into the first iteration approximately six years ago on April 29, 2013 after CSG Investments, Inc., an affiliate of LNV, was approached by Emergent. Complaint ¶ 25.[5] The proceeds of that Loan and Security Agreement (the "<u>Initial Loan Agreement</u>") were

---

[4]   Because the Complaint references and relies on the Loan Agreement, the Court may consider it in rendering its decision on the Motion. *See, e.g.*, *Winshall v. Viacom Int'l Inc.*, 76 A.3d 808, 818 (Del. 2013). A copy of the Loan Agreement is attached to the Hershey Declaration.

[5]   Emergent's liquidity issues were partly due to investigations by multiple government agencies relating to (among other things) its financial reporting. Imperial Holdings, Inc., Annual Report (Form 10-K), at 2 (Mar. 28, 2013) (reporting a "limited cash position [that] was primar[ily] as a result of the legal and other costs of the defense and investigation of the Company and certain employees in connection with the USAO Investigation, SEC investigation and related shareholder litigation."). The Court may consider Emergent's SEC filings for purposes of the Motion. *See Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014). Copies of the relevant portions of all SEC filings cited herein are attached to the Hershey Declaration.

used, in part, to refinance White Eagle's existing debt and maintain its portfolio.  *See* Emergent Capital, Inc., Quarterly Report (Form 10-Q), at 36-37 (May 14, 2013).

Less than three years later, in 2016, White Eagle was again running out of cash. Plaintiffs allege that they faced "liquidity problems" due in part to substantial legal and professional fees in the prior few years.  Complaint ¶ 29.  Thus, in the fall of 2016, White Eagle again approached LNV asking to further amend and increase the facility.  *Id.* ¶ 30.  After extensive negotiations among the parties and their counsel, LNV agreed to a loan modification that was executed in December 2016 (the "Second Amendment").  *Id.* ¶ 31.[6]  Pursuant to the Second Amendment, LNV agreed to, among other things, increase its commitment from $250 million to $370 million and reduce its Participation Interest from 50% to 45%.  *Id.* ¶¶ 36, 47.

In July 2017, a majority of Emergent's shares were acquired by PJC Investments, LLC ("PJC"), which remains Emergent's largest and controlling shareholder.  Emergent Capital, Inc., Current Report (Form 8-K), at 8 (July 28, 2017).  PJC made this acquisition well after the Loan Agreement had been executed and with full knowledge of its terms.

## A.    The LTV Ratio And Related Waterfall

Under the Loan Agreement, the parties agreed to a detailed payment waterfall for all cash coming into White Eagle, the only source of which is the maturity or sale of policies.  Loan Agreement §§ 5.2(b), (c) & (e).  Available cash must go first to service specific White Eagle operational expenses and its policy premiums.  *Id.*  After that, all available cash must generally pay amortization and interest on LNV's loan.  Only after the loan is paid down, or the portfolio rises in value, to the point where the loan-to-value ratio falls below 65%, can White Eagle

---

[6]    On May 16, 2014, a first amendment to the Initial Loan Agreement was effectuated to reflect certain modifications that are not relevant for purposes of this Motion.

receive a cash distribution.  *Id.*[7]  In this way, the amount of cash that White Eagle can receive and dividend to Emergent (as opposed to paying down the LNV loan) is tied to the balance of the outstanding loan, providing LNV with a critical safeguard for which it bargained.

There is no ready-made, objective index of value for the life settlement policies that White Eagle owns because each underlying insured represents a unique life.  These are variable assets that are difficult to value.  As Emergent recently explained to its shareholders, "the significant [valuation] inputs are unobservable and require significant management judgment or estimation[,]" and "[c]onsiderable judgment is required in interpreting market data to develop the estimates of [the life settlement portfolio's] fair value."[8]  As a result, who values the life settlement assets, and how they are valued, is expressly addressed in the Loan Agreement: White Eagle agreed that LNV would set the value in its "sole" and "reasonable" discretion.  Loan Agreement, Annex I, I-17 (definition of "Lender Valuation"), I-19 (definition of "LTV").[9]  The Loan Agreement also sets out methodologies and assumptions for valuing the collateral that "shall be deemed to be reasonable."  Loan Agreement, Annex I, I-17 (definition of "Lender Valuation").[10]  These include the use of "reasonable actuarial practices on a probabilistic basis" and market comparisons, as well as all "similar methodolog[ies] and assumptions."  *Id.*  White

---

[7]    If White Eagle paid the loan down to a loan-to-value ratio of between 50% and 65%, then only 70% of the cash would be required to be used to directly repay the debt.  *Id.*  If White Eagle paid the debt down further and reached a loan-to-value ratio of 35%-50%, only 55% of the cash would be required to go directly to debt repayment.  *Id.*  And for a loan-to-value ratio below 35%, only 45% of the cash was required to go directly to debt repayment.  *Id.*

[8]    Emergent Capital, Inc., Quarterly Report (Form 10-Q), at 30, 39 (Apr. 10, 2019).

[9]    The Loan Agreement defines LTV as the outstanding amount of the loan facility divided by the "Lender Valuation[,]" which is determined in LNV's "sole" discretion.  Loan Agreement, Annex I, I-19.  "Lender Valuation" is, in turn, defined as the value of the Pledged Policies (other than any Excluded Policies) as determined by LNV "in [its] reasonable discretion."  *Id*. at I-17.

[10]   Plaintiffs notably mischaracterize this provision as setting forth methodologies and assumptions that "might be reasonable."  Complaint ¶ 34.

Eagle expressly "acknowledge[d] that the foregoing methodology is likely to change over time to account for market conditions and [LNV's] experience in the life settlement marketplace and that any such changes to the methodology shall be in [LNV's] reasonable judgment." *Id.*

Plaintiffs allege that third-party D3G, in conjunction with Lewis & Ellis, valued the life settlement assets for LNV. Complaint ¶ 41.[11] D3G is specifically identified in the Loan Agreement as an entity that the parties had relied on previously and that would continue to perform tasks under the Loan Agreement. *See* Loan Agreement, Annex I, I-16 (definition of "Insurance Consultant"), *id.* § 7.1(n) (referring to D3G verifying policy coverage); *id.* § 7.1(b)(xiii) (referring to D3G providing applicable reports); *id.* § 9.1(i) (White Eagle agreed to use D3G in the event of an audit); *id.* Annex I, I-12 (defining an "Excluded Policy" as one where D3G is unable to verify the policy coverage). And Lewis & Ellis is the firm that Plaintiffs claim themselves to entrust with valuations of the portfolio. *See* Complaint ¶ 41.

## B.    LNV's Participation Interest

As part of the "consideration for the Lenders providing financing," White Eagle also agreed that LNV would receive a "Participation Interest." Loan Agreement, Third Recital, at 1. The Participation Interest is a 45% share of cash received as proceeds of White Eagle's life settlement policies that is available for distribution after the previous steps in the payment waterfall, such as servicing costs, premiums and repayment of the debt, have been satisfied. *Id.* Annex I, I-21 (definition of "Participation Interest"); *see also id.* §§ 5.2(b), (c) & (e). White Eagle's obligation to pay the Participation Interest is one of White Eagle's "Obligations" under the Loan Agreement and is secured by a lien on White Eagle's assets. *Id.* Annex I, I-20; *id.*

---

[11]    While LNV must treat the facts alleged in the Complaint as true for purposes of this Motion, it notes that Lewis & Ellis merely provides actuarial data and does not perform valuations. Indeed, the Debtors' CFO recently testified to that effect in her deposition.

§ 2.6. The Participation Interest is not subject to reduction and is payable irrespective of whether the loan has matured or any loan funds were advanced or remain outstanding, until all of the Pledged Policies mature or are sold. *Id.* §§ 5.2(e), 13.4.

The Participation Interest is distinct from the interest payable under the loan. *Compare id.* §§ 3.1-3.3 *with id.* § 3.4. Interest and the Participation Interest are paid at different stages of the payment waterfall. *See id.* §§ 5.2(b) & (c). Unlike interest, the Participation Interest can be assigned, or not assigned, separately from other obligations. *Id.* § 13.4. And Plaintiffs have publicly stated that the Participation Interest is debt, not equity. *See, e.g.*, Emergent Capital, Inc., Quarterly Report (Form 10-Q), at 30 (Apr. 10, 2019) ("The Company elected to account for the ***debt*** under the White Eagle Revolving Credit Facility . . . ***which includes the 45% interest in policy proceeds payable to the lender***") (emphasis added).

## C.    The Up-Front Fee

White Eagle also agreed to pay an "Up-Front Fee" of $4 million to LNV upon closing of the Initial Loan Agreement in 2013. Loan Agreement, Annex I, I-30; *id.* § 2.1(a); *id.* Annex I, I-15. The current Loan Agreement acknowledges that all "Fees," which includes the Up-Front Fee, "had been paid or were paid out of the proceeds of the Initial Advance." *Id.* § 7.1(b)(viii). Therefore, when the Loan Agreement was amended and restated for the second time in 2017, the Up-Front Fee had already been earned by LNV and paid by White Eagle.

## D.    Other Relevant Sections Of The Loan Agreement

The parties stipulated that their agreement does not create a joint venture or any fiduciary relationship between the parties or make LNV responsible for any of White Eagle's losses:

> ***Notwithstanding the obligation of the Borrower to pay the Aggregate Participation Interest to the Lenders*** . . . the relationship of each Secured Party and the Borrower is solely one of lender and borrower and ***this Loan Agreement does not constitute a*** . . . ***joint venture*** between any of the Secured Parties and the

Borrower, ***nor does this Loan Agreement create an agency or fiduciary relationship between any of the Secured Parties and the Borrowers*** . . . The parties hereto intend that the relationship among them shall be solely that of creditor and debtor. ***No Secured Party shall in any way be responsible or liable for the debts, losses, obligations or duties of the Borrower.***

Loan Agreement § 13.14 (emphasis added). The Loan Agreement also contains an integration clause, *id.* § 13.10, and a broad release as to all matters concerning the Loan Agreement, *id.* § 13.16. It is governed by New York law. *Id.* § 13.5.

## III.    Silver Point And GWG Unsuccessfully Bid For White Eagle's Assets

Plaintiffs allege that defendants Silver Point Capital L.P. ("Silver Point") (a hedge fund) and GWG Holdings, Inc. ("GWG") (a life settlement competitor of White Eagle) both offered to purchase White Eagle's portfolio in the months before its bankruptcy filing. Complaint ¶ 6. Plaintiffs claim that LNV was somehow "behind" these offers, *id.* ¶ 56, and that Silver Point and GWG were somehow acting as LNV's "proxies." *Id.* ¶ 58. Specifically, Plaintiffs allege that certain of Defendants' current and former employees corresponded with each other during GWG's and Silver Point's negotiations with White Eagle. *Id.* ¶¶ 53-55. None of the bids was accepted, and White Eagle did not sell its assets to either Silver Point or GWG.

## IV.    The Debtors File For Bankruptcy And Plaintiffs Bring This Action

As of October 31, 2018, D3G, with input from Lewis & Ellis, had valued the life settlement portfolio at $552 million. *Id.* ¶ 22.[12] Compared to the amount outstanding under the Loan Agreement on the next distribution date, this valuation left White Eagle with a loan-to-value ratio higher than 65% such that, under the waterfall, all funds after the payment of any of White Eagle's operating expenses were required to go directly to pay down the loan. *See* Loan Agreement, Annex I, I-5. Plaintiffs repeatedly pressed to be able to take cash out of White Eagle

---

[12]   Notably, Emergent publicly reported a valuation of $506.4 million as of November 30, 2018—almost $50 million less than LNV's reported valuation from a month earlier. *See* Emergent Capital, Inc., Transition Report (Form 10-KT), at 1 (Mar. 15, 2019).

to dividend to Emergent anyway.

On November 14, 2018, Plaintiffs Lamington Road and White Eagle GP filed voluntary chapter 11 petitions with this Court.  *See* Declaration of Miriam Martinez, Chief Financial Officer, in Support of First Day Motions, Case No. 18-12808, [D.I. 3] ("First Day Declaration") ¶ 17.  These filings caused an Event of Default under the Loan Agreement, which accelerated all Obligations under the Loan Agreement, including White Eagle's obligation to pay the full amount of the Participation Interest for all policies.  Loan Agreement §§ 10.1(f), 10.2(b).

On December 13, 2018, White Eagle filed a voluntary petition under chapter 11 with this Court, with the stated purpose of negating various provisions of the Loan Agreement.  *See* First Day Declaration ¶ 19.  The Debtors claim that they were "forced . . . into bankruptcy" by LNV's conduct.   Complaint ¶ 51.   The Debtors filed for bankruptcy with a "cash balance of approximately $33 million" and, according to the Debtors, an "equity cushion of approximately $184 million."  First Day Declaration ¶ 20.  Indeed, Plaintiffs contend that both White Eagle and Emergent are "indisputably solvent" and that "even at LNV's improperly low valuations, their assets exceed their liabilities by between $150 million and $200 million."  Complaint ¶ 5.[13]

## LEGAL STANDARD

To survive dismissal, a complaint must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   This requires more than "labels and conclusions,"

---

[13]   Although it has no relevance to any claim, Plaintiffs allege that LNV did not implement a litigation hold until "months after LNV . . . anticipated litigation with White Eagle and Emergent."  Complaint ¶ 60.  This is false.  LNV's standard data retention policy has been in place at all times.  LNV spent the months leading up to the Debtors' bankruptcies negotiating with Plaintiffs in good faith, when Plaintiffs suddenly served LNV with a draft complaint in November 2018.  Immediately upon receiving the draft complaint (and months before the complaint was filed), LNV implemented its standard litigation hold, which remains in place.

*Youkelsone v. In re Wash. Mut. Inc.* (*In re Wash. Mut. Inc.*), 741 F. App'x 88, 93 (3d Cir. 2018),

or the "sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at

678. Accordingly, a complaint's "[f]actual allegations must be enough to raise a right to relief

above the speculative level[,]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), such that a

court can "infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679. These

standards apply in adversary proceedings. *Beskrone v. OpenGate Capital Grp. (In re*

*Pennysaver USA Publ'g, LLC)*, 587 B.R. 445, 454 n. 50 (Bankr. D. Del. 2018).

## ARGUMENT

### I.   Plaintiffs Have Not Pled A Breach Of The Loan Agreement (Count I)

Under the mutually agreed terms in the Second Amendment, White Eagle agreed that

after the payment of operating expenses, ***all*** cash from the policies would go to repaying LNV's

loan unless the loan-to-value ratio was below 65%. White Eagle agreed that, unless that

threshold was met, it could not release cash or dividend it to its parent. Loan Agreement, Annex

I, I-5. The parties further agreed that the "value" in this ratio, which Plaintiffs have

acknowledged requires significant judgment to determine, would be conducted in LNV's

reasonable discretion. This was a critical, bargained-for protection for LNV.[14]

When a contract gives one party discretion, as here, a party challenging the exercise of

that discretion faces a high burden. A breach of such provisions only occurs where a party has

"act[ed] ***arbitrarily or irrationally*** in exercising that discretion." *Doe v. Nat'l Bd. Of Podiatric*

---

[14]   Plaintiffs could have bargained for any number of different structures for the calculation of the portfolio's value and the determination of when White Eagle could keep more cash for itself. LNV bargained for, and the parties agreed, that LNV would set the valuation in its "sole" and "reasonable discretion" as a means of balancing the risks inherent to the loan. That agreement controls. *See, e.g.*, *Gillman v. Chase Manhattan Bank*, 73 N.Y.2d 1, 14 (1988) (declining "to disturb the allocation of risks to which the parties have agreed."); *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 735 (2d Cir. 1984) (same).

*Med. Exam'rs*, No. 03-cv-4034 (RWS), 2005 U.S. Dist. LEXIS 2021, at *15 (S.D.N.Y. Feb. 18, 2005) (citing *Dalton v. Educ. Testing Serv.,* 87 N.Y.2d 384, 389 (1995)) (emphasis added).  The threshold for such a showing is high: the plaintiff must plead facts showing that the exercise of discretion was "'without sound basis in reason and . . . generally taken without regard to the facts.'"  *Doe*, 2005 U.S. Dist. LEXIS 2021 at *28 (quoting *Heintz v. Brown*, 80 N.Y.2d 998, 1001 (1992)).  Thus "reasonable discretion is commonly understood to allow a decision maker to choose from a broad range of choices not conflicting with law or reason."  *Interpharm, Inc. v. Wells Fargo Bank, N.A.*, 655 F.3d 136, 146 (2d Cir. 2011).

Plaintiffs allege that LNV's valuations of the life settlement portfolio (i) were "unreasonable" (Complaint ¶¶ 3, 80); (ii) were different from other valuations Plaintiffs received (*id.* ¶ 41); and (iii) should have assigned some (unidentified) value to some (unidentified) number of policies that had matured (*id.* ¶ 43).  None of these challenges pleads facts showing an arbitrary or irrational exercise of discretion.

### A.    Plaintiffs Fail To Plead Sufficient Facts To State A Claim For Breach

Plaintiffs baldly claim that LNV's valuations of the portfolio "cannot possibly be 'reasonable.'"  Complaint ¶ 61.  Though the portfolio was valued every quarter, Plaintiffs do not identify which valuations they claim were unreasonable.  Nor do Plaintiffs plead what the "true" valuation was on any particular valuation date.  Additionally, Plaintiffs do not allege that LNV's methodologies and assumptions differed from those that were agreed to be reasonable in the contract.  LNV highlighted each of these missing pieces in its motion to dismiss Plaintiffs' original complaint (D.I. 31 at 13), and Plaintiffs did not address any of these failures in their amended complaint.  With these glaring omissions, Plaintiffs fall far short of pleading facts showing that LNV's valuations were arbitrary or irrational.

Indeed, as a rule, "[g]iven the deference afforded to corporations that contractually

reserve to themselves the discretion to make decisions based on their business judgment, attacks on methodology used, or the conclusion reached, are generally of little significance." *Gen. Motors Corp. v. Dealmaker*, No. 07-cv-141 (TJM), 2009 U.S. Dist. LEXIS 39278, at *11 (N.D.N.Y. May 8, 2009). This is especially true where, as here, the assets in question are (by Plaintiffs' own admission) difficult to value. *See Christie's Inc. v. Davis*, 247 F. Supp. 2d 414, 421 (S.D.N.Y. 2002) (where contract granted the creditor the right to value the debtor's artwork collateral "in its discretion," the Court found "the fact that one art dealer's valuations of some of the pledged works are somewhat higher than [the creditor's] estimates is not in itself probative of the unreasonableness of those estimates").[15] The bare conclusion that a complex valuation "cannot possibly be 'reasonable'" does not state a claim. Complaint ¶ 61.

Moreover, on the facts as pled, LNV hired third-party D3G, which in turn relied on Lewis & Ellis, to conduct this valuation, which further evidences LNV's reasonable exercise of its discretion. Plaintiffs do not challenge the credentials or capabilities of D3G or Lewis & Ellis. Nor could they, as the Loan Agreement designates D3G as the "Insurance Consultant" vested with substantial responsibility, including issuing a report regarding the value of the collateral as a condition precedent to every additional policy advance that White Eagle obtains under the facility. Loan Agreement § 7.3(i); *id.* Annex I, I-16. And Plaintiffs claim that they also rely on valuations provided by Lewis & Ellis. Complaint ¶ 41. LNV's reliance on these third parties to value the portfolio further supports its reasonable exercise of discretion. *See Gen. Motors Corp.*,

---

[15] The Second Circuit addressed and rejected a similar argument in *Interpharm,* in which the borrower alleged that the lender had abused its discretion under the parties' credit agreement by relying on a third-party assessment of the borrower's liquidation value to reduce the borrower's available credit. *Id.* 655 F.3d at 146-47. The court found that where the credit agreement gave the lender "reasonable discretion" to conduct the valuation, the borrower "may disagree . . . with the valuation . . . but the facts alleged do not show that [the lender's actions] fell outside the broad range of discretion conferred by the Credit Agreement." *Id.* at 147.

2009 U.S. Dist. LEXIS 39278, at *12 (where a business "engaged an outside vendor to prepare a marketing report tailored to the specific [issue]," it had properly exercised its discretion).

**B.**      **Plaintiffs Fail To Show That Any Valuations Relied On By LNV Were Arbitrary Or Irrational**

Plaintiffs also allege—again without any dates or amounts—that unspecified valuations provided to LNV were "tens of millions of dollars lower" than unspecified valuations provided to Plaintiffs.  Plaintiffs have not identified any basis for LNV or the Court to identify what breach Plaintiffs are claiming and whether any such claim is plausible.  Furthermore, all parties agree that these valuations require significant judgment and interpretation.  Even if there were an LNV valuation "tens of millions of dollars" lower than one from Plaintiffs, a difference of $10 million on a portfolio valued at over half a billion dollars (Complaint ¶ 2) is less than 2%.  A deviation of this size in a complex valuation that requires substantial judgment does not support an abuse of discretion.  Moreover, taking as true D3G's reported October 31, 2018 valuation of $552 million—the only valuation that Plaintiffs plead with specificity (Complaint ¶ 22)— Emergent's own valuation as of November 30, 2018 was $506.4 million, almost $50 million *lower* than LNV's.[16]

Plaintiffs also allege that the unidentified valuations they challenge resulted in a loan-to-value ratio above 65% such that, under the waterfall, excess cash could not flow to White Eagle for potential distribution to Emergent.  Complaint ¶ 42.  This says nothing about whether LNV's valuation was arbitrary or irrational.  Furthermore, while Plaintiffs claim to have unpled valuations that they claim would have resulted in a different loan-to-value ratio, the existence of a competing valuation does not mean that a valuation was arbitrary or irrational.  And Plaintiffs state no reason why their valuations, which conveniently place Plaintiffs above the waterfall

---

[16]   Emergent Capital, Inc., Transition Report (Form 10-KT), at 1 (Mar. 15, 2019).

threshold, would not give rise to the same adverse inferences they seek to ascribe to LNV. *See Christie's Inc. v. Davis*, 247 F. Supp. 2d at 421 (finding fact that defendant's valuation differed from plaintiff's was not probative of misconduct).

### C.     Plaintiffs Fail To State A Claim Based On Policies That Have Matured

Plaintiffs also argue that LNV abused its discretion under the Loan Agreement because LNV's valuations did not assign value to unidentified policies that had matured but not been paid. Complaint ¶ 41. As above, Plaintiffs do not plead how many policies they are challenging or the effect such policies allegedly had on the overall value of the portfolio. In any event, Plaintiffs effectively admit that the Loan Agreement does not assign value to matured policies in the collateral valuation by arguing that the absence of such value is an "oversight" or "a typographical error." *Id.* This argument is barred by both the parol evidence rule and the Loan Agreement's integration clause.

Further, far from being "perverse" (*id.* ¶ 43), LNV's treatment of matured policies is consistent with the plain terms of the Loan Agreement. On a policy's maturity date, it becomes due and should be paid out. When there is a lag between the maturity date and the pay out,[17] the policy proceeds are an account receivable, as Plaintiffs themselves suggest. *See id.* Under the Loan Agreement, Pledged Policies and accounts receivable are distinct forms of collateral accorded different treatment. *See* Loan Agreement § 2.6. Pledged Policies are taken into account in the Lender Valuation, while other forms of collateral, such as accounts receivable, are not. *Id.*, Annex I, I-17 (definition of "Lender Valuation"), I-19 (definition of "LTV"). Had the parties intended to include the value of other forms of collateral in the Lender Valuation, they could have done so. Declining to include accounts receivable of matured policies in the Lender

---

[17]   Such a lag can happen, for example, because insurance companies contest their obligation to pay out the policy. *Id.* ¶ 65.

Valuation, consistent with express provisions of the Loan Agreement, cannot be an arbitrary or irrational exercise of LNV's discretion.  *See generally Morgan Stanley & Co. v. Peak Ridge Master SPC Ltd.*, 930 F. Supp. 2d 532, 540 (S.D.N.Y. 2013) ("Such broad authority, which was specified in the contract and is necessary to stabilize an unpredictable market, has not been compromised by the courts."); *Interpharm*, 655 F.3d at 146 ("[I]t would hardly be unreasonable for a lender to view receivables subject to . . . reductions as a less reliable indicator of anticipated borrower income than receivables not subject to such reductions").

## II.   Plaintiffs Have Not Stated A Claim For Breach Of The Covenant Of Good Faith And Fair Dealing (Count II)

Plaintiffs also attempt to bring a claim for breach of the implied covenant of good faith and fair dealing.  This claim fails for several reasons.

As an initial matter, much of Plaintiffs' implied covenant claim is identical to their breach of contract claim—again (baselessly) challenging the valuation of the life settlement portfolio.  "[W]here a plaintiff alleges breach of contract based on the defendant's failure to exercise discretion pursuant to contract or industry-based standards, a separate [c]laim for breach of the implied covenant of good faith and fair dealing premised on the bad faith exercise of that discretion will be dismissed as duplicative."  *See Madison 92nd St. Assoc., LLC v. Courtyard Mgmt. Corp.*, No. 653449/2015 (EB), 2016 N.Y. Misc. LEXIS 4272, at *29 (Sup. Ct. N.Y. Cty. 2016).[18]  Likewise, an implied covenant claim must be dismissed where "the relief sought in claiming a breach of the implied covenant of good faith is intrinsically tied to the damages

---

[18]   *See also FCOF UB Secs. LLC v. Morequity, Inc.*, 663 F. Supp. 2d 224, 231 (S.D.N.Y. 2009) ("New York law requires dismissal of an implied covenant claim where the claim derives from the same set of facts as a breach of contract claim."); *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002) ("New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based on the same facts, is also pled.").

allegedly resulting from the breach of contract." *19 Recordings Ltd. v. Sony Music Entm't*, 97 F. Supp. 3d 433, 439 (S.D.N.Y. 2015) (citation omitted); *Canstar v. J.A. Jones Constr. Co.*, 212 A.D.2d 452, 453 (1st Dep't 1995) (same).  Here, Plaintiffs' implied covenant claim relies on the exact same facts and seeks the exact same relief as the breach of contract claim, and should be dismissed as duplicative.  *Compare* Complaint ¶¶ 74-80 *with id.* ¶¶ 82-84, 93-96.

Plaintiffs' other implied covenant assertions also fail.  Plaintiffs claim that the expenses they pay to service White Eagle's portfolio, which LNV approved "in its sole and absolute discretion," are too high.  *Id.* ¶¶ 44-45.  Plaintiffs do not identify the specific third-party fees they complain of, any alleged dollar amount for these expenses or any other facts sufficient to allege that LNV has taken an arbitrary or irrational approach to the servicing of the portfolio.  And the only example Plaintiffs provide is the hiring of D3G, which cannot be arbitrary or irrational, as Plaintiffs agreed in the Loan Agreement for D3G to perform various services, including to value the collateral for additional policy advances.  Loan Agreement § 7.3(i); *id.* Annex I, I-16.

Similarly, Plaintiffs claim that LNV has denied White Eagle and Emergent access to cash under the waterfall, but fail to state any facts showing that LNV's alleged actions exceeded its rights under the Loan Agreement.  Plaintiffs' conclusory allegations that LNV's exercise of its contractual discretion had negative results for Plaintiffs are not enough to state a claim for breach of the implied covenant.[19]  *See Transit Funding Assocs., LLC v. Capital One Equip. Fin. Corp.*, 149 A.D.3d 23, 29 (1st Dep't 2017) (dismissing implied covenant claim where "[i]n view of the

---

[19]   Plaintiffs also reference another of LNV's bargained-for protections under the Loan Agreement:  LNV's "sole and absolute" discretion to require Emergent to improve its solvency before White Eagle receives a distribution from the waterfall.  Loan Agreement, Annex I, I-5.  Plaintiffs do not plead that LNV relied on this discretion to halt distributions to White Eagle at any time, let alone facts showing that LNV exercised this discretion in an irrational or arbitrary manner, as the law requires.  Plaintiffs also do not plead facts showing that questioning Emergent's solvency would be arbitrary or irrational and, indeed, they plead that Emergent faces "a threat of severe ongoing cash constraints in the near future."  Complaint ¶ 5.

provisions of the loan agreement expressly allowing [lender] to deny any requests for advances in its 'sole and absolute discretion' . . . it cannot be said that [lender] violated the contract by failing to advance funds as requested, even if that decision put [borrower] out of business."). [20]

Additionally, Plaintiffs try to manufacture an implied covenant claim based on an allegation that LNV advanced $6 million to White Eagle under the Loan Agreement, allowed White Eagle to use approximately $388,000 of that sum to pay for costs and expenses, but then refused to let White Eagle keep the remaining balance and dividend it to Emergent.  Complaint ¶ 48.  Plaintiffs do not cite any contractual obligation to release any additional funds (hence their reliance on the implied covenant).  Plaintiffs' argument is prohibited by the Loan Agreement's integration clause, which precludes the introduction of purported oral agreements that were not memorialized in the Loan Agreement.  Loan Agreement § 13.10.  That alone is grounds for dismissal.  *See Azuma N.V. v. Sinks*, 646 F. Supp. 122, 127 (S.D.N.Y. 1986) ("One of the oldest and most settled principles of New York law is that a party may not offer proof of prior oral statements to alter or refute the clear meaning of unambiguous terms of written, integrated contracts to which assent has voluntarily been given.").

Furthermore, an express provision of the Loan Agreement governs the $6 million advance: it provides that $388,096.36 of the $6 million identified by Plaintiffs may be used to cover costs and expenses and, beyond that, the funds could be used "solely to pay Debt Service and Ongoing Maintenance Costs, and the Borrower shall not withdraw any such proceeds for any other purpose."  Loan Agreement § 5.1(c).  Plaintiffs cannot use the implied covenant to

---

[20]  *See also Veneto Hotel & Casino, S.A. v. German Am. Capital Corp.*, 160 A.D.3d 451 (1st Dep't 2018) (dismissing implied covenant claim where the defendant exercised discretion afforded to it under the contract); *Pitcairn Props. v. LJL 33rd St. Assocs., LLC*, No. 11 Civ. 7318 (JSR), 2012 U.S. Dist. LEXIS 173881, at *15 (S.D.N.Y. Nov. 19, 2012) (same); *CapLOC, LLC v. McCord*, No. 17 Civ. 5788 (AT) (RWL), 2018 U.S. Dist. LEXIS 99321, at *12 (S.D.N.Y. June 12, 2018) (same).

contradict these express terms.  *See Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d 490, 497 (S.D.N.Y. 2002) (dismissing implied covenant claim that would "create obligations that go beyond those intended and stated in the language of the contract.").[21]

### III.  <u>Plaintiffs' Claim For Breach of Fiduciary Duty Must Be Dismissed (Count IV)</u>

Courts are loath to imply a joint venture relationship among sophisticated parties to a commercial contract.  Under New York law, establishing a joint venture requires a plaintiff to show (among other things) that the parties entered an agreement that evinces their intent to be joint venturers **and** under which they share both profits and losses.  *Galvstar Holdings, LLC v. Harvard Steel Sales, LLC*, 722 Fed. App'x 12, 14 (2d Cir. 2018) (citations omitted); *see also Kidz Cloz, Inc. v. Officially for Kids, Inc.*, 320 F. Supp. 2d 164, 171 (S.D.N.Y. 2004) ("The absence of any one element is fatal to the establishment of a joint venture.") (internal quotation omitted); *Goureau v. Goureau*, No. 12 Civ. 6443 (PAE), 2013 U.S. Dist. LEXIS 14929, at *15 (S.D.N.Y. Feb. 4, 2013) (granting motion to dismiss for failing to plead "the existence of a joint venture [which] is a necessary predicate to plaintiffs' claims of breach of fiduciary duty").

Attempting to re-write the parties' relationship completely, Plaintiffs seek to manufacture fiduciary duties from LNV to White Eagle by arguing that LNV's Participation Interest is actually equity in White Eagle giving rise to a joint venture and, thus, fiduciary duties.  Complaint ¶ 95.  In addition to contradicting Plaintiffs' (equally meritless) argument that the Participation Interest constitutes unmatured interest, this argument fails for several reasons: (i) the relationship between LNV and White Eagle is solely one of lender and borrower; (ii) the Loan Agreement expressly precludes a joint venture; (iii) LNV does not share losses with White Eagle; and (iv) Plaintiffs have failed to plead a breach of fiduciary duty.

---

[21]  White Eagle also released LNV from all claims arising out of or related to the Transaction Documents.  Loan Agreement § 13.16.  Thus, even if true, this claim was expressly released.

A.    **The Loan Agreement Obligations, Including The Participation Interest, Are Debt**

The relationship between LNV and White Eagle is plainly that of lender and borrower. While Plaintiffs rely on the Participation Interest as creating a joint venture, the Loan Agreement says the opposite, specifying that "the obligation of the Borrower to pay the Aggregate Participation Interest to the Lenders" does not alter the fact that "the relationship of each Secured Party and the Borrower is solely one of lender and borrower[.]"  Loan Agreement § 13.14.  And Emergent's own public filings refer to the Participation Interest as debt.  *See* Emergent Capital, Inc., Quarterly Report (Form 10-Q), at 30 (Apr. 10, 2019) ("The Company elected to account for ***the debt*** under the White Eagle Revolving Credit Facility. . . ***which includes the 45% interest in policy proceeds to the lender***[.]") (emphasis added).  This lender/borrower relationship does not give rise to fiduciary duties.  *Sharp Int'l Corp. v. State St. Bank & Tr. Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 52 n.2 (2d Cir. 2005) ("The legal relationship between a borrower and a bank is a contractual one of debtor and creditor and does not create a fiduciary relationship between the bank and its borrower.") (citing *Bank Leumi Tr. Co. v. Block 3102 Corp.*, 180 A.D.2d 588, 589, 580 N.Y.S.2d 299, 301 (1st Dep't 1992)).

B.    **The Loan Agreement Expressly Precludes A Joint Venture**

Courts routinely dismiss joint venture claims where the parties have expressly agreed that there is no joint venture between them.  *See, e.g.*, *Galvstar Holdings*, 722 Fed. App'x at 14 (plaintiff failed to plead a joint venture where the parties expressly disclaimed a joint venture); *Awards.com v. Kinko's, Inc.*, 42 A.D.3d 178, 185 (1st Dep't 2007) (finding plaintiffs' joint venture argument was meritless where agreement provided parties were neither partners nor joint venturers); *Naqvi v. Comput. Assocs. Int'l, Inc.*, No. 100875/06, 2012 N.Y. Misc. LEXIS 6319,

at *16-17 (Sup. Ct. N.Y. Cty. Mar. 23, 2012) (same).[22]

> That is precisely the case here.  The parties agreed that:
>
> [T]he relationship of each Secured Party and the Borrower *is solely one of lender and borrower* and this Loan Agreement *does not constitute* a partnership, tenancy-in-common, joint tenancy or *joint venture* between any of the Secured Parties and the Borrower, *nor does this Loan Agreement create* an agency *or fiduciary relationship* between any of the Secured Parties and the Borrowers.

Loan Agreement § 13.14 (emphasis added).  LNV is not aware of a single case applying New York law imposing a joint venture and fiduciary duties between contractual parties where there exists an express provision to the contrary in their written agreement.[23]

### C.    LNV Does Not Share Losses, Precluding A Joint Venture

A further requirement for a joint venture is that the parties share in the venture's losses. *See Steinbeck v. Gerosa*, 4 N.Y.2d 302, 317 (1958) ("An indispensable [element] of a contract of partnership or joint venture, both under common law and statutory law, is a mutual promise or undertaking of the parties to share in the profits of the business *and submit to the burden of making good the losses*.") (emphasis in original) (citation omitted); *see also Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 68 (2d Cir. 2003) (same); *Slabakis v. Schik*, 164 A.D.3d 454, 455 (1st

---

[22]    *See also Slip-N-Slide Records, Inc. v. Island Def Jam Music Group*, No. 13-cv-04450 (ALC), 2014 U.S. Dist. LEXIS 70186, at *6-7 (S.D.N.Y. May 21, 2014) ("[T]he Court finds that the parties did not evince an intent to form a joint venture, given that the Agreement is a product of an arm's length commercial transaction between the parties that does not bare any indicia of a fiduciary relationship, and that it expressly disavows a joint venture."); *Bronx Legal Servs. v. Legal Servs.*, No. 02-cv-6199 (GBD), 2003 U.S. Dist. LEXIS 695, at *23 (S.D.N.Y. January 17, 2003) (finding no joint venture where the contract disavowed partner relationship); *Ritchie Capital Mgmt., L.L.C. v. Coventry First LLC*, No. 07-cv-3494 (DLC), 2007 U.S. Dist. LEXIS 51081, at *17 (S.D.N.Y. July 17, 2007) ("[P]laintiffs' effort to avoid the contractual denial of a partnership and joint venture fails"); *Branisteanu v. TM Sys., Inc.*, No. 90-cv-5149 (PNL), 1992 U.S. Dist. LEXIS 4824, at *3 (S.D.N.Y. Apr. 10, 1992) (finding no joint venture where contract expressly stated that parties did not intend to enter into a joint venture).

[23]    This rule prevails because a joint venture requires the intent to create one.  *See Galvstar Holdings*, 722 Fed. App'x at 14.  And "the best evidence of what parties to a written agreement intend is what they say in their writing." *Id.* (citing *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010)).

Dep't 2018) ("The failure to provide for the sharing of losses from the project is fatal to plaintiff's claim that a joint venture was created.").[24]  The Loan Agreement states that "[n]o Secured Party shall **in any way** be responsible or liable for the **debts, losses, obligations or duties** of the Borrower."  Loan Agreement § 13.14 (emphasis added).  This precludes a joint venture.

Indeed, Plaintiffs repeatedly plead that LNV does not bear the risk of loss under the Loan Agreement.  They emphasize that White Eagle has essentially guaranteed LNV full payment on every policy in its portfolio, and bears all of the risk and costs associated with litigation over those policies.  Complaint ¶ 65.  They further admit that the most LNV stands to "lose" from White Eagle is to receive no return on its 45% Participation Interest.  *Id.* ¶ 94.

Plaintiffs try to claim loss sharing based on (i) LNV's Participation Interest, (ii) LNV's recourse to the assets of White Eagle and (iii) White Eagle's status as a limited liability entity.  Complaint ¶ 108.  None of these arguments has merit.  The Participation Interest allows LNV to participate in certain of White Eagle's cash flows—it does not make LNV responsible for White Eagle's losses.  An entitlement to a portion of cash flows without loss-sharing is not a joint venture.  *See De Vito v. Pokoik*, 150 A.D.2d 331, 332 (2d Dep't 1989) ("[A]n agreement to distribute the proceeds of an enterprise upon a percentage basis, or the sharing of gross returns, does not in and of itself establish a joint venture"); *Roberts v. 112 Duane Assocs. LLC*, 32 A.D.3d 366, 367 (1st Dep't 2006) ("[E]ven plaintiff's claimed bonus . . . would not have made him a partner absent an agreement to share in partnership or joint venture losses"); *Slip-N-Slide Records*, 2014 U.S. Dist. LEXIS 70186, at *9 (rejecting attempt to construe "distribution of

---

[24]  New York law governs all claims arising from the Loan Agreement.  *See* Loan Agreement § 13.5.  But Delaware law would reach the same result.  *See, e.g.*, *First State Orthopaedics, P.A. v. Gallagher Bassett Servs, Inc.*, No. N17C-06-320 (WCC), 2018 Del. Super. LEXIS 204, at *16-17 (Del. Sup. Ct. New Castle May 3, 2018) (granting motion to dismiss upon finding that no joint venture existed where there was "nothing to suggest" shared losses).

profits to include an agreement to share losses" as "strained and implausible").

Similarly, LNV has recourse to White Eagle's assets as security for the underlying Obligations. That security interest, a protection for LNV, does not impose loss-sharing on LNV.

Finally, White Eagle's status as a limited liability entity *shields* its owners from losses—it does not cause its owners to *share* losses. Plaintiffs' argument would mean that all equity owners in a corporation or other limited liability vehicle are joint venturers owing fiduciary duties to each other, which is not the law.

### D.      Plaintiffs Have Not Pled A Breach Of Fiduciary Duty

Plaintiffs also have not pled a breach of any fiduciary duty. As discussed above, LNV followed the express provisions of the Loan Agreement and exercised its bargained-for discretion, precluding a claim for breach of fiduciary duty. *See Lawsky v. Condor Capital Corp.*, 154 F. Supp. 3d 9, 26 (S.D.N.Y. 2015) ("It is not a breach of fiduciary duty to comply with the terms of a contract."); *Ray Legal Consulting Grp. v. Dijoseph*, 37 F. Supp. 3d 704, 729 (S.D.N.Y. 2014) ("Because [defendant] has acted in accordance with its obligations under the [contract], it has not breached its fiduciary duty.").

## IV.      Plaintiffs Cannot State A Claim For Civil Conspiracy (Count VI)

A civil conspiracy claim under New York law requires an underlying tort. *Alexander & Alexander, Inc. v. Fritzen*, 68 N.Y.2d 968, 969 (1986) ("Allegations of conspiracy are permitted only to connect the actions of separate defendants with an otherwise actionable tort.") (citation omitted); *Thome v. Alexander & Louisa Calder Found.*, 70 A.D.3d 88, 110 (1st Dep't 2009) ("New York does not recognize an independent cause of action for civil conspiracy.") (citation omitted). Thus, the plaintiff "must demonstrate the primary tort" in addition to the elements of conspiracy: (i) an agreement between two or more parties; (ii) an overt act in furtherance of the agreement; (iii) the parties' intentional participation in the furtherance of a plan or purpose; and

(iv) resulting damage or injury.  *Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, 331 F.

Supp. 3d 221, 245-46 (S.D.N.Y. 2018) (citations omitted).[25]  Plaintiffs fail to meet this burden.

Plaintiffs' civil conspiracy claim is premised on breach of fiduciary duty and tortious

interference with contract.  As shown in Section III, *supra*, Plaintiffs have failed to plead any

fiduciary duty and any breach.  And Plaintiffs do not (and cannot) state a cause of action for

tortious interference against LNV because LNV cannot tortiously interfere with, or conspire to

tortiously interfere with, an agreement to which it is a party.  *See Finley v. Giacobbe*, 79 F.3d

1285, 1295 (2d Cir. 1996) (under New York law "a plaintiff bringing a tortious interference

claim must show that the defendants were not parties to the contract") (citation omitted);

*Bereswill v. Yablon*, 6 N.Y.2d 301, 306, 189 N.Y.S.2d 661, 664, 160 N.E.2d 531, 533 (1959)

("[I]t is a long-established doctrine that one does not have a cause of action against another

contracting party for conspiracy to breach the agreement between them.").[26]  Accordingly,

Plaintiffs' civil conspiracy claim against LNV fails for lack of an underlying tort.  *See, e.g.*, *Gym*

*Door Repairs, Inc.*, 331 F. Supp. at 245-46 ("It is essential that each defendant charged with

acting in concert have acted tortiously[.]") (citations omitted); *Clark v. Allen & Overy LLP*, No.

453138/2017, 2019 N.Y. Misc. LEXIS 251, at *10 (Sup. Ct. N.Y. Cty. Jan. 16, 2019)

(dismissing civil conspiracy claim for failure to sufficiently plead primary tort); *Arm Real Estate*

*Grp., LLC v. Dalan Mgmt.*, No. 158967/2015, 2016 N.Y. Misc. LEXIS 2322, at *18-19 (Sup. Ct.

---

[25]   Similarly, under Delaware law, a civil conspiracy claim requires an underlying tort coupled with "(1) agreement to participate in an unlawful act, (2) an injury, and (3) an unlawful overt act in furtherance of the agreement."  *Tracinda Corp. v. DaimlerChrysler AG (In re DaimlerChrysler AG Sec. Litig.)*, 197 F. Supp. 2d 42, 74 (D. Del. 2002) ("civil conspiracy is not an independent cause of action, and thus, a civil conspiracy claim must be predicated upon an underlying wrong.") (citations omitted).  Thus, Delaware law would equally require dismissal.

[26]   This rule applies equally in Delaware.  *See Tolliver v. Trinity Par. Found.*, No. 14-1021 (LPS) 2017 U.S. Dist. LEXIS 121764, at *46 (D. Del. Aug. 2, 2017) ("A party to a contract cannot interfere or conspire to interfere with its own contract.").

N.Y. Cty. June 8, 2016) (same).

Plaintiffs have also failed to plead damages or injury, which is necessary to plead a claim for civil conspiracy. *See Gym Door Repairs, Inc.*, 331 F. Supp. 3d at 245-46. At worst, the result of Defendants' alleged "conspiratorial" conduct amounted to an "attempt to purchase White Eagle's portfolio at below the portfolio's value." Complaint ¶ 108. But White Eagle did not sell. Plaintiffs fail to show how having parties bid for their assets caused them any injury.

Plaintiffs attempt to manufacture damages by claiming that the alleged conspiracy to bid for White Eagle's assets somehow "deprived [Plaintiffs] of the cash flows to which they were entitled . . . [and] forced [the Debtors] into bankruptcy." *Id.* ¶ 104. But again, Plaintiffs do not explain how unaccepted offers to buy White Eagle's portfolio could possibly have deprived Plaintiffs of cash or caused the Debtors' bankruptcy filings. Indeed, these are the same injuries Plaintiffs claim from LNV's purported breach of contract, just repackaged as damages arising from the alleged conspiracy. Moreover, Plaintiffs' allegation that the Debtors were somehow forced into bankruptcy is belied by their claim that the Debtors are "indisputably solvent," *id.* ¶ 49, and entered bankruptcy with $33 million in cash. First Day Declaration ¶ 20. This claim must therefore be dismissed. *See Corris v. White*, 29 A.D.2d 470, 473 (4th Dep't 1968) (dismissing conspiracy claim for "failing to allege damages sustained by plaintiff as a result of the conspiracy").

Nor have Plaintiffs stated an actionable conspiracy. Plaintiffs allege that Silver Point and GWG made bids for the White Eagle assets alongside LNV and that, during that bidding process, certain of Defendants' current and former employees corresponded with each other. Complaint ¶¶ 55-56, 88. Even if accepted as true, there would be nothing improper about such communications, and they certainly cannot create an actionable conspiracy. Moreover, this

supposed conspiracy does not pass basic plausibility standards.  Plaintiffs do not, and cannot, allege that LNV had any financial interest in Silver Point or GWG acquiring White Eagle's portfolio.  Indeed, Plaintiffs' allegation is that LNV's purported "ultimate goal" is "the acquisition of . . . White Eagle's portfolio."  *Id.* ¶ 30.  That goal would be undermined, not advanced, by Silver Point and GWG making competing bids for the same assets.

Plaintiffs also allege that Silver Point and GWG both reduced their offers after "the industry's key actuarial firms" announced updates to their life expectancy tables.  *Id.* ¶ 57.  That this major market event drove prices down for both of these purchasers "within days of each other" does not plead a plausible conspiracy.  *Id.*  Indeed, White Eagle's CFO, in her first day declaration, testified that these updates to the life expectancy tables "would have the effect of reducing the value of the Debtors' insurance portfolio."  *See* First Day Declaration ¶ 17.  The fact that Silver Point and GWG agreed with her does not suggest a conspiracy.  Nor do Plaintiffs allege that the two offers were the same or close; therefore, the allegations suggest, if anything, that Silver Point and GWG were competing against each other, not colluding.  Plaintiffs' "bare allegation of conspiracy supported only by an allegation of conduct that is readily explained as individual action plausibly taken in the actors' own economic interests" is insufficient to withstand a motion to dismiss.  *Iqbal v. Hasty*, 490 F.3d 143, 177 (2d Cir. 2007).

## V.    Emergent Has No Standing To Bring Any Claims

Emergent is a Plaintiff in Counts I-VI of the Complaint, but it is not a party to the Loan Agreement, so it has no standing to assert any of these claims, which arise from LNV's alleged breach of the Loan Agreement and purported fiduciary duties arising from it.

Plaintiffs appear to recognize this flaw and make a conclusory statement that Emergent is an "intended third-party beneficiary" of the Loan Agreement.  Complaint ¶ 70.  But non-parties can only enforce a contract if (i) the nonparty is "the only one who could recover for the breach

of contract" or (ii) it is "clear from the language of the contract" that there was "an intent to permit enforcement by the third party." *Dormitory Auth. of the State of N.Y. v. Samson Constr. Co.*, 30 N.Y.3d 704, 710 (2018) (citations omitted).  Emergent is one of four plaintiffs and, thus, is obviously not the only party that can sue.  And there is no intent in the Loan Agreement to give Emergent enforcement rights.  To the contrary, the Loan Agreement contains inurement, non-assignability and merger clauses, all of which preclude a finding that any non-party has unstated enforcement rights.  Loan Agreement §§ 13.4, 13.10; *see Veleron Holding, B.V. v. BNP Paribas SA*, No. 12 Civ. 5966 (CM), 2014 U.S. Dist. LEXIS 199357, at \*60 (S.D.N.Y. Apr. 16, 2014) (dismissing a purported third-party beneficiary's breach of contract claim for lack of standing where the contract contained an inurement, non-assignability and merger clause).[27]

## VI.    Plaintiffs' Attempt To Recharacterize The Participation Interest As "Unmatured Interest" Fails (Count VII)

The Participation Interest is a secured portion of LNV's "claim" under section 101(5) of the Bankruptcy Code,[28] and is enforceable under applicable non-bankruptcy law.  *See Britton v. Diprima*, 71 A.D.3d 1560, 1562 (4th Dep't 2010) (upholding right to damages based on "profit sharing provision" of loan).  The Participation Interest is therefore an allowed part of LNV's claim unless it meets one of the exceptions to allowance set forth in section 502(b).  *See Travelers Cas. & Sur. Co. of Am. v. PG&E Co.*, 549 U.S. 443 (2007) (a claim allowed under state law is valid unless otherwise invalidated under section 502(b)).  Plaintiffs argue that the Court should recharacterize the Participation Interest as "additional interest" and that the

---

[27]   Emergent's corporate relationship with White Eagle is also insufficient to create third-party beneficiary status. *See, e.g.*, *Solutia Inc. v. FMC Corp.*, 385 F. Supp. 2d 324, 338 (S.D.N.Y. 2005) ("[A] benefit received through corporate ownership is insufficient to establish rights as a third-party beneficiary.").

[28]   Under section 101(5)(A), a "claim" includes a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured[.]"

exception for "unmatured interest" in section 502(b)(2) applies here.  Plaintiffs' argument fails because the Participation Interest is neither interest nor unmatured.

### A.      The Participation Interest Is Not "Interest"

Plaintiffs' argument relies on the notion that any obligation to a lender that is not principal is "necessarily" additional interest.  Complaint ¶ 114.  But this assertion is contradicted by section 506(b) of the Bankruptcy Code, which allows for "reasonable fees, costs and charges" alongside and distinct from interest.  *See U.S. v. Ron Pair Enters.*, 489 U.S. 235, 242 (1989) (recognizing that under section 506(b) "interest" and "fees, costs, or charges" are "two types of recovery [that] are distinct.").  Congress therefore expressly contemplated that debt instruments can contain payment obligations other than principal and interest, as courts have routinely acknowledged.  *See, e.g., Del. Tr. Co. v. Energy Future Intermediate Holding Co. LLC (In re Energy Future Holdings Corp.)*, 842 F.3d 247 (3d Cir. 2016) (lenders were entitled to redemption premium in addition to payment of principal and interest); *In re Ryker*, No. 06-1872, 2007 U.S. App. LEXIS 17993, at *8-10 (3d Cir. July 26, 2007) (affirming bankruptcy court's determination that mortgagee was entitled to reasonable attorneys' fees under section 506(b)); *In re Sch. Speciality, Inc.*, No. 13-10125, 2013 Bankr. LEXIS 1897, at *17-19 (Bankr. D. Del. Apr. 22, 2013) (upholding the allowance of make-whole payments as liquidated damages) (citing *In re Trico Marine Servs.*, 450 B.R. 474, 480-81 (Bankr. D. Del. 2011)); *Atrium View, LLC v. E. Sav. Bank, FSB (In re Atrium View, LLC)*, No. 07-02478 (MDF), 2008 Bankr. LEXIS 3441, at *6-7 (Bankr. M.D. Pa. Dec. 24, 2008) ("A prepayment premium is a type of 'charge'") (citations omitted); *In re Graboyes*, 371 B.R. 113, 123 (Bankr. E.D. Pa. 2007) ("A late charge is generally justified as a type of liquidated damage clause").

The Participation Interest is not "interest" for several additional reasons.

*First*, the Loan Agreement treats interest and the Participation Interest separately with

(i) separate provisions for the timing and calculation of payment (Loan Agreement §§ 3.1-3.4), (ii) payment at different stages of the payment waterfall (*id.* §§ 5.2(b), (c) & (e)), (iii) different provisions regarding assignment (*id.* § 13.4), and (iv) different provisions regarding repayment if White Eagle's tax attributes are compromised (*id.*).

*Second*, interest is typically stated as a percentage of the outstanding loan, and is often defined as specific compensation to a lender for the time value of the money loaned.  *See Brown v. Hiatts*, 82 U.S. 177, 185 (1872) ("Interest is the compensation allowed by law, or fixed by the parties, for the use or forbearance of money[.]"); *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 571 (7th Cir. 1992) (referencing "the loss of the time value of money").  Plaintiffs themselves define interest as "the cost of borrowing money."  Complaint ¶ 115.  However, unlike interest, the Participation Interest is not tied to the loan balance in any way: it was earned by LNV at the inception of the facility and remains the same irrespective of how much White Eagle has borrowed on the revolver or how long such amounts have been outstanding.  In *Noonan v. Fremont Fin. (In re Lappin Elec. Co.)*, the court rejected a similar attempt to characterize a prepayment premium as unmatured interest, stating that "the charge is independent of the amount owed at termination, thus negating any characterization as interest."  245 B.R. 326, 330 (Bankr. E.D. Wis. 2000).  The same rationale applies here.

*Third*, interest under the Loan Agreement and the Participation Interest are awarded in exchange for different benefits provided by LNV.  Interest is paid to LNV in exchange for amounts loaned under the Loan Agreement; hence, interest is calculated as a percentage of the funds loaned and ceases to be owed once those loans are repaid.  The Participation Interest was granted to LNV in exchange for entering into the Initial Loan Agreement and providing the commitments thereunder, and, as noted above, is owed regardless of whether any amounts have

actually been borrowed or repaid.

*Fourth*, unlike interest, the Participation Interest survives repayment of the loan. It remains in place until the last policy securing the Loan Agreement obligations matures or is otherwise monetized. Therefore, unlike interest, the Participation Interest does not cease to be payable once the principal under the Loan Agreement is accelerated or repaid.

*Fifth*, the Participation Interest depends entirely on the revenue stream from White Eagle's portfolio of life insurance policies, and is payable from the net cash flow (if any) that remains after payment of certain expenses that have priority in the payment waterfall. Therefore, unlike interest, the Participation Interest has no minimum payment requirement, and may at times not be paid at all. *See Blue Citi, LLC v. 5Barz Int'l Inc.*, 338 F. Supp. 3d 326, 335 (S.D.N.Y. 2018) ("Interest is, by definition, a payment made with a degree of certainty and regularity"); *Bailey v. Harrington*, 462 So. 2d 861, 861 (Fla. Dist. Ct. App. 1985) ("The profit participation provision of the loan agreement did not . . . charge any additional interest on the loan. It provided that the lender was entitled to share 43% of the profits, if any, from the construction project which the loan financed. This payment cannot constitute additional interest on the loan as it was not payable at all if no profits were realized from the project.").[29]

## B.   The Participation Interest Is Not Unmatured

Plaintiffs' claim also fails because, even if the Participation Interest were interest (and it is not), it is not unmatured. Whether a payment obligation is unmatured for purposes of section 502(b) turns on *when* the payment obligation was earned. *See Official Comm. of Unsecured Creditors v. UMB Bank, N.A. (In re Residential Capital, LLC)* ("*ResCap*"), 501 B.R. 549, 587

---

[29]   Plaintiffs argue that the Participation Interest is "a form of contingent interest that does not become due and payable except as and to the extent that the contingency (the satisfaction of certain metrics) occurs for any given quarter." Complaint ¶ 116. That the amount of any payment on the Participation Interest may vary by quarter does not make it "interest."

(Bankr. S.D.N.Y. 2013) (noting that the legislative history of section 502(b)(2) states that disallowed interest shall include "any portion of prepaid interest that represents an original discounting of the claim [but] ***would not have been earned on the date of bankruptcy***") (citing H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 352-54 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6308) (emphasis added); *In re McMurray*, 218 B.R. 867, 870 (Bankr. E.D. Tenn. 1998) (section 502(b)(2) "establishes a general rule that interest on a debt is collectible from the bankruptcy estate only to the extent it is earned before the filing of the bankruptcy petition.") (citations omitted);    *In re Alves*, No. 05-22840, 2007 Bankr. LEXIS 1843, at *11-12 (Bankr. W.D.N.Y. May 25, 2007) ("unmatured interest is interest that has not been earned."); *In re Moore*, 307 B.R. 394, 397 (Bankr. S.D.N.Y. 2004) ("The Bankruptcy Code does not provide a definition for what constitutes 'unmatured interest' but case law has defined it as an interest . . . that has not been 'earned' as of the filing of the bankruptcy petition[.]").

White Eagle gave LNV the Participation Interest at the inception of the Initial Loan Agreement as "consideration for the Lenders providing financing" thereunder.  As such, LNV ***earned*** the Participation Interest at the inception of the Initial Loan Agreement (unlike interest, which is earned over time based on outstanding funds that are loaned).  White Eagle's real contention is that the Participation Interest is unmatured because it depends on the occurrence of future contingent events.  That does not render White Eagle's obligation to make such payments unmatured.  *In re Holm*, 931 F.2d 620 (9th Cir. 1991) (debtor objecting to a creditor's claim for an award based on future lost profits was "confusing the term 'unmatured interest' with the calculation that provides the present value of future profits.  Future profits are not unmatured interest.").

The entirety of the Participation Interest is matured, due and payable for the additional

reason that, on November 14, 2018, White Eagle GP and Lamington Road filed chapter 11 cases, triggering an Event of Default and accelerating all "Obligations" under the Loan Agreement, which expressly includes the Participation Interest. *See* Loan Agreement §§ 10.1(f), 10.2(b). This automatic acceleration clause is enforceable under New York law. *See Thyssenkrupp Elevator Corp. v. Gristedes's Foods, Inc.* No. 60169314, 2006 N.Y. Misc. LEXIS 9338, at *5 (Sup. Ct. N.Y. Cty. Feb. 27, 2006) (citing *Fifty States Mgmt. Corp. v. Pioneer Auto Parks, Inc.*, 46 N.Y.2d 573, 577 (1979)). And New York law makes clear that obligations owed post-acceleration are enforceable. *In re Energy Future Holdings Corp.*, 842 F.3d at 248 ("[I]n New York the consequences of acceleration of the debt depend on the language chosen by the parties in the pertinent loan agreement.") (quoting *NML Capital v. Republic of Arg.*, 17 N.Y.3d at 262). The Participation Interest was therefore fully payable no later than November 14, 2018.[30] As of that date, there was nothing more for LNV to do under the Loan Agreement—its claim was completely matured, including the Participation Interest.[31]

---

[30]  There is no *ipso facto* prohibition that would supplant the express terms of the Loan Agreement accelerating the Participation Interest because the Loan Agreement is a financial accommodation. *See* 11 U.S.C. § 365(e)(2)(B) (prohibition of enforcement of *ipso facto* contracts does not apply if "such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor[.]"); *U.S. Bank Tr. Nat'l Ass'n v. AMR Corp. (In re AMR Corp.)*, 730 F.3d 88, 106-07 (2d Cir. 2013) (holding that *ipso facto* prohibition did not apply to an indenture because it was non-executory); *see also* Loan Agreement § 10.2(f) (providing that the "Loan Agreement is, and is intended to be, a contract to extend financial accommodations to the Borrower within the meaning of Section 365(e)(2)(B) of the Federal Bankruptcy Code[.]"). In any event, the acceleration of the Participation Interest was the result of the chapter 11 filings of White Eagle GP and Lamington Road. White Eagle did not file for bankruptcy until 29 days later. *See Lehman Bros. Special Fin. v. Bank of Am. N.A. (In re Lehman Bros. Holdings)*, 553 B.R. 476, 498 (Bankr. S.D.N.Y. 2016) (finding that "by the plain terms of the Code, a modification [caused by an *ipso facto* clause] that occurred before [the relevant debtor's petition date] is not prohibited."). Therefore, on the date of White Eagle's bankruptcy filing, acceleration had already occurred.

[31]  The fact that the Participation Interest must now be valued does not mean that White Eagle's obligation to pay it is unmatured. Courts regularly value matured but unliquidated claims, including those that involve future contingencies.

C.    White Eagle Should Not Be Permitted To Use Section 502(b)(2) To Avoid Its Contractual Obligations, Including The Participation Interest

The policies underlying section 502(b)(2) and the Bankruptcy Code as a whole firmly support allowance of the Participation Interest in its entirety and dismissing Plaintiffs' claim that it constitutes "unmatured interest."  In *Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, the court noted that "[w]here the specific characteristics of a transaction create uncertainty as to whether a claim includes unmatured interest, federal courts do not base their decisions on economic theories of interest.  Instead, they evaluate the transaction in light of the principles that underlie Section 502(b)(2) and the policies that flow throughout the Bankruptcy Code."  322 F.3d 1039, 1047 (9th Cir. 2002).  The court cited numerous decisions that had determined various types of payments were not "unmatured interest" because they would "undermine bankruptcy policy of encouraging consensual out-of-court workouts"; "impede [the] creditor's ability to sell bonds and provide windfall to bankruptcy debtor"; or otherwise "would not further the policies that underpin Section 502(b)(2)" or other bankruptcy policies.  *Id.* at 1047-48.

In accordance with these principles, to date, courts in the Third Circuit have disallowed only conventional unearned interest and unearned OID under section 502(b)(2).  Moreover, the Debtors claim to be solvent, and there is no reason for this Court to expand the meaning of "interest" under section 502(b)(2) to include the Participation Interest, where such disallowance would benefit only the equity holders that pushed White Eagle into bankruptcy.  *See Fox Sports Net West 2, LLC v. L.A. Dodgers LLC (In re L.A. Dodgers LLC)*, 465 B.R. 18, 32 (D. Del. 2011) ("[I]t appears this is a solvent debtor case, and, as such, the equities strongly favor holding the debtor to his contractual obligations so long as those obligations are legally enforceable under applicable non-bankruptcy law.") (citations omitted); *CSC Tr. Co. v. Energy Future Intermediate Holdings Co. LLC (In re Energy Future Holdings Corp.)*, 513 B.R. 651, 659 (Bankr. D. Del.

2014) (same); *see also Official Comm. of Unsecured Creditors v. Dow Chem. Corp. (In re Dow Corning Corp.)*, 456 F.3d 668, 679 (6th Cir. 2005) ("When a debtor is solvent . . . the presumption is that a bankruptcy court's role is merely to enforce the contractual rights of the parties").[32]

The Participation Interest was a crucial incentive for LNV to commit hundreds of millions of dollars under the Initial Loan Agreement, all of which LNV did in fact commit (and thereafter fully fund). The Debtors cannot recharacterize the Participation Interest as "unmatured interest" and thus obtain the perverse result of a secured creditor, which would fare better in a liquidation, having its claim reduced under section 502(b)(2) for the purpose of providing a windfall to equity. *See Consol. Rock Prods. Co. v. Du Bois*, 312 U.S. 510, 527 (1941) ("Whether a company is solvent or insolvent in either the equity or the bankruptcy sense, any arrangement of the parties by which the subordinate rights and interests of the stockholders are attempted to be secured at the expense of the prior rights of creditors comes within judicial denunciation.") (citation omitted).[33]

---

[32] *See also UPS Capital Bus. Credit v. Gencarelli (In re Gencarelli)*, 501 F.3d 1, 7 (1st Cir. 2007) ("When the debtor is solvent, the bankruptcy rule is that where there is a contractual provision, valid under state law, the bankruptcy court will enforce the contractual provision.") (citations omitted); *Premier Entm't Biloxi LLC v. U.S. Bank Nat'l Assoc. (In re Premier Entm't Biloxi LLC)*, 445 B.R. 582, 636 (Bankr. S.D. Miss. 2010) (noting in the section 502(b) context that in solvent debtor cases, "the task for the bankruptcy court is simply to enforce creditors' rights according to the tenor of the contracts that created those rights") (citation omitted).

[33] In a chapter 7 liquidation, White Eagle's portfolio of life settlement policies would either be turned over to LNV or sold under section 363 of the Bankruptcy Code (for which LNV could credit bid). 11 U.S.C. §§ 363(f), 725; *see In re M. Paolella & Sons, Inc.*, No. 86-00495F, 1991 Bankr. LEXIS 1181, at *83 (Bankr. E.D. Pa. Apr. 15, 1991) ("In a chapter 7 case, a secured creditor would be entitled to receive its collateral, or the proceeds therefrom, if the trustee were to liquidate it."). The proceeds of a sale of White Eagle's policies would be distributed to LNV on account of its claim, including postpetition interest, fees, costs and charges (including the Participation Interest) under section 506(b) of the Bankruptcy Code. *See Villarreal v. Showalter (In re Villarreal)*, 413 B.R. 633, 639 (Bankr. S.D. Tex. 2009).

**VII.    The Recharacterization Claim Should Be Dismissed (Count VIII)**

Plaintiffs argue that the Participation Interest should be recharacterized as equity separately from the rest of the Loan Agreement.  But there is no logic or precedent for analyzing just one piece of a broader transaction for recharacterization, and the Participation Interest is not equity in disguise.[34]

**A.    The Loan Agreement Is A Debt Transaction That Must Be Considered In Its Entirety**

Plaintiffs rename the Participation Interest a "Participation" and seek to recharacterize just that one piece of the Loan Agreement.  This should be rejected.  Recharacterization evaluates the true character of the parties' entire transaction, not the character of each individual obligation one by one.  *See, e.g., Carolina Shores, LLC v. Dixon (In re Daufuskie Island Props., LLC)*, 431 B.R. 649, 656 (Bankr. D. S.C. 2010) ("The Court acknowledges that a few aspects of the CS Note might suggest a capital contribution was made, such as the participation interest after the debt was paid; however, after fully considering the [recharacterization] factors and the circumstances of the transaction, the Court concludes that the CS Note is more consistent with a loan.").  LNV is unaware of any case that recharacterized some obligations in a deal as "equity" when the overall transaction was plainly debt.  It is particularly nonsensical to evaluate the Participation Interest in isolation, as the Participation Interest is part of the consideration that LNV received under the Loan Agreement, and not a contribution that LNV made to White Eagle.

**B.    The Participation Interest Is Not Equity**

If the Participation Interest were severed from the broader transaction, it is debt and not

---

[34]   Dismissal under Rule 12(b)(6) is appropriate where the pleaded facts fail to state a claim for recharacterization.  *See*, *e.g*., *In re Exide*, 299 B.R. 732, 740-42 (Bankr. D. Del. 2003) (granting motion to dismiss recharacterization claim); *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S&B Holdings LLC)*, 420 B.R. 112, 160 (Bankr. S.D.N.Y. 2009) (same).

an equity interest.  The "overarching inquiry" on a recharacterization claim is "a court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else."  *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 456 (3d Cir. 2006).  Unlike the typical recharacterization case, the Loan Agreement is not between a company and an insider; it is an arm's-length transaction between unaffiliated parties that Plaintiffs admit was heavily negotiated.  Complaint ¶¶ 24-35.[35]  This alone precludes recharacterization.  *See Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 750 (6th Cir. 2001) ("'the more [a transaction] appears to reflect. . . an arm's length negotiation, the more likely such a transaction is to be treated as debt.'") (quotation omitted).[36]

Moreover, the factors courts typically consider in determining whether a transaction constitutes debt or equity overwhelmingly show that this is debt and not equity.[37]  For example:

- The name given to the instrument - The Participation Interest exists under the "Second Amended and Restated Loan and Security Agreement";

- The source of repayment - The Participation Interest is paid with a portion of White Eagle's revenues (if there is sufficient value in the waterfall to pay it) and does not require the declaration of a dividend;

- The adequacy of capitalization - The Debtors contend that White Eagle is solvent;

- The identity of parties - There is no identity of interest between the creditor (LNV) and the

---

[35]  LNV is not aware of any case in the Third Circuit in which the court recharacterized a loan made by a non-insider.

[36]  S*ee also Fairchild Dornier GmbH v. Official Comm. of Unsecured Creditors (In re Dornier Aviation (N. Am.), Inc.)*, 453 F.3d 225, 234 (4th Cir. 2006) (the factors looked to by courts "all speak to whether the transaction appears to reflect the characteristics of . . . an arm's length negotiation.") (citations omitted); *Fin Hay Realty Co. v. U.S.*, 398 F.2d 694, 696 (3d Cir. 1968) ("[T]he arm's-length relationship between the corporation and a shareholder who supplies funds to it inevitably results in a transaction whose form mirrors its substance.").

[37]  In assessing recharacterization claims, courts in the Third Circuit regularly apply the multi-factor test set forth in *In re Autostyle Plastics, Inc.*, 269 F.3d at 749-50, and certain other factors. *See Official Comm. of Unsecured Creditors of HH Liquidation, LLC v. Comvest Grp. Holdings, LLC (In re HH Liquidation, LLC)*, 590 B.R. 211, 292-97 (Bankr. D. Del. 2018).

stockholder (Lamington Road and White Eagle GP);

- The presence or absence of security - The Participation Interest is fully secured, along with White Eagle's other obligations to LNV;

- Subordination to outside creditors - The Participation Interest gets paid ahead of any other White Eagle obligations that are not permitted under the Loan Agreement (including any other debt) and before any distributions to White Eagle that can then be used to make dividends to equity;

- Voting rights - The Participation Interest does not provide LNV with any voting (or other governance or control) rights over White Eagle; and

- The parties' accounting - From the inception of the Loan Agreement through November 2018, Emergent categorized the Participation Interest as debt in its public filings.[38]

Nor is the Participation Interest actually "equity" in any sense. LNV does not hold any White Eagle equity—as Plaintiffs plead, 100% of White Eagle is owned by Lamington Road and White Eagle GP. Complaint ¶ 9.[39]

## C.    Recharacterization Is Improper In A Solvent Debtor Case

The Debtors allege that White Eagle is "indisputably solvent." As a result, there is no benefit in using estate resources to prosecute a recharacterization action, which is grounded in the court's equitable powers, against LNV. All this claim seeks to do is shift estate value from White Eagle's secured creditor to its equity. In the only case LNV has found of a solvent debtor pursuing recharacterization, the court held that "recharacterization would run counter to the broad policies of the Code and would not serve to enforce any specific provision of the Code." *Mirant Mid-Atl., LLC v. Morgantown OL1 LLC (In re Mirant Corp.)*, 327 B.R. 262, 269 (Bankr. N.D. Tex. 2005). The court further held that "the scheme of the bankruptcy laws is not consistent with providing advantage to a debtor's equity ownership at the expense of that

---

[38]   *See, e.g.*, Emergent Capital, Inc., Quarterly Report (Form 10-Q), at 30 (Apr. 10, 2019) ("The Company elected to account for the debt under the White Eagle Revolving Credit Facility . . . which includes the 45% interest in policy proceeds payable to the lender.").

[39]   As noted above, Emergent's SEC filings say the same thing. *See, e.g.*, Emergent Capital, Inc., Quarterly Report (Form 10-Q), at 30 (Apr. 10, 2019).

debtor's creditors." *Id.* at 271.  As such, the court dismissed the complaint, *id.* at 273.  So too should this Court.

**VIII.** **Plaintiffs' Request For A Declaratory Judgment That The Participation Interest Resulted In OID Must be Dismissed (Count IX)**

Plaintiffs also seek to transform the Participation Interest from a critical and bargained-for item of consideration *for* LNV into a sword to be used *against* LNV to shrink LNV's allowed debt claim below the amount that LNV actually funded.  Plaintiffs do so by urging a dramatic expansion of the concept of original issue discount, claiming, contrary to the Loan Agreement itself, that: (i) some portion of the face value of LNV's loan was consideration for the Participation Interest and (ii) this consideration gives rise to OID, the unmatured portion of which should be deducted from the allowed amount of LNV's claim.  This conception of OID goes well beyond what any court has previously recognized, and is directly contrary to long-standing precedent declining to expand OID in a manner that would contradict policy considerations in favor of consensual, out-of-court debt negotiations.

**A.** **Because The Face Amount Of The Loan Agreement Was Fully Funded, There Is No OID**

OID arises "when a bond is issued for less than its face value."  *See In re Chateaugay Corp.*, 961 F.2d 378, 380 (2d Cir. 1992).  To the extent that OID constitutes unmatured interest, it is subject to disallowance pursuant to section 502(b)(2) of the Bankruptcy Code.  OID exists when a lender does not advance the funds stated on the face of the debt instrument, and the unamortized delta may be treated as interest in bankruptcy.  The House committee report on Section 502 provides an illustration:

> [A] claim on a $1,000 note issued the day before bankruptcy would only be allowed *to the extent of the cash actually advanced*.  If the original issue discount was 10% so that the cash advanced was only $900, then notwithstanding the face amount of [the] note, only $900 would be allowed.

H.R. Rep. No. 595, 95th Cong., at 352-53 (emphasis added); *see also* 11 U.S.C. § 502(b)(2).

This definition of OID does not apply here.  Plaintiffs admit that LNV provided $367.9 million in financing (other than asserting that some portion up to $4 million was not actually loaned because White Eagle paid the Up-Front Fee, discussed *infra*).  *See* First Day Declaration ¶ 11.  That alone defeats Plaintiffs' argument because there was simply no "discount"—funded financing, by definition, cannot constitute OID.  *See In re Allegheny Int'l, Inc.*, 100 B.R. 247, 252 (Bankr. W.D. Pa. 1989) ("Where the original consideration equals the face amount of the debentures, no discount can arise since the issue price equals their face amount.") (citing *Cities Serv. Co. v. U.S.*, 522 F.2d 1281, 1288 (2nd Cir. 1974)).  LNV is unaware of a single bankruptcy case supporting Plaintiffs' novel argument that a fully-funded loan can create OID.  Having borrowed $367.9 million from LNV, Plaintiffs cannot escape repayment by creating a fiction in which White Eagle never really received the money.

**B.        Plaintiffs Cannot Isolate The Participation Interest To Create OID**

As in their claim for recharacterization, Plaintiffs ask the Court to break the Loan Agreement into pieces and to view the Participation Interest in isolation.  In this claim, Plaintiffs urge that some portion of LNV's $367.9 million loan was consideration specifically for the Participation Interest.  Complaint ¶ 130.[40]  Plaintiffs thus claim that what White Eagle provided—the promissory note plus the Participation Interest—had greater "value" than the $367.9 million advanced by LNV, and the delta should be disallowed as OID.  Ultimately, Plaintiffs hope that the Court will set a value for the Participation Interest and deduct it from LNV's allowed claim for the funds it actually advanced to LNV.  *Id.* ¶¶ 130, 133-134.

OID does not work this way.  It is a specific doctrine targeted to ensuring that the

---

[40] Nothing in the Loan Agreement explicitly allocates consideration to the Participation Interest.  In fact, the Loan Agreement treats all amounts funded as loan advances.

principal portions of a creditor's claim match the amount of consideration the creditor actually advanced, rather than the face amount of the debt instrument.  *See In re Oakwood Homes Corp.*, 449 F.3d 588, 597 n.7 (3d Cir. 2006).  It is not a tool for re-cutting the value exchanged by arms'-length parties, and it is certainly not a vehicle for a borrower to allege, after the fact, that it overpaid for its funding and that the lender's funded claim should be reduced accordingly.  As above, LNV is aware of no bankruptcy case recharacterizing consideration provided by a borrower under a loan agreement as creating OID. [41]

Plaintiffs also argue that the Participation Interest is "like a warrant" and, therefore, creates OID.  Complaint ¶ 132.  That is incorrect.  The Participation Interest is an additional component of LNV's secured claim.  In any event, recharacterizing the Participation Interest, yet again, as "like a warrant"  does not assist Plaintiffs in disallowing any portion of LNV's claim, because it still does not give rise to OID.

### C.    The Court Should Reject Plaintiffs' Effort To Expand The OID Doctrine

As a matter of policy, bankruptcy courts decline to disallow portions of a loan as OID where to do so would "create[] a disincentive for creditors to cooperate with a troubled debtor." *Chateaugay*, 961 F.2d at 382 (holding that a face value exchange of bonds, despite creating OID under tax law, did not create disallowable unmatured interest under section 502(b)(2)); *In re Pengo Indus., Inc.*, 962 F.3d at 549-51 (same); *ResCap*, 501 B.R. at 588-89 (holding the same with respect to fair value exchanges).  This is because of the benefits of "offer[ing] companies

---

[41]   Tax courts have taken a more expansive view of OID than bankruptcy courts.  It is well-settled that the law and policy concerns about OID are different in the tax context.  *See, e.g., In re Pengo Indus., Inc.*, 962 F.2d 543, 550 (5th Cir. 1992) ("[T]his is not a tax case.  We stress that the tax treatment of original issue discounting does not control our inquiry, which is placed firmly within the bankruptcy framework.").  Bankruptcy courts therefore do not treat OID the same way as tax courts.  *See In re Chateaugay,* 961 F.2d at 383 (holding that a debt exchange did not create disallowable unmatured interest notwithstanding that the exchange resulted in OID under the Tax Code).

the opportunity to restructure out-of-court, avoiding the time and costs—both direct and indirect—of a bankruptcy proceeding." *Id.* at 578-579. Courts recognize that disallowing accommodations as OID would hinder lenders' willingness to lend money in these circumstances, and have therefore repeatedly declined to expand disallowance beyond its existing bounds. *See Chateaugay*, 961 F.2d at 383 ("In the absence of unambiguous statutory guidance, we will not attribute to Congress an intent to place a stumbling block in front of debtors seeking to avoid bankruptcy with the cooperation of their creditors.").

When Emergent faced liquidity issues and reached out to LNV for the initial facility, and again when Emergent requested an amendment and increase of the loan, LNV provided much-needed financing. The loan was structured to address the unique circumstances of White Eagle's business, such as the long timeline to monetize White Eagle's policies and uncertain cash flows. This structure included providing LNV with the Participation Interest. *See* Complaint ¶¶ 21, 24, 29. This negotiated solution should be encouraged rather than penalized.

Expanding the doctrine of OID is particularly unwarranted in this case, given that the Debtors claim to be solvent and LNV is effectively their sole creditor. Disallowing a portion of White Eagle's claim would not benefit a broader creditor constituency. It would simply provide a windfall to existing equity. *See Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d at 1047 ("[C]ases applying Section 502(b)(2) often turn on whether allowance or disallowance will contravene bankruptcy policy, unfairly prejudice other creditors or provide a windfall to the debtor."). It should be rejected for this reason as well.

## IX. Plaintiffs' Request For A Declaratory Judgment That The Up-Front Fee Resulted In OID Must Be Dismissed (Count X)

Plaintiffs' amended complaint also contains the new claim that the $4 million Up-Front Fee—another critical, bargained-for piece of consideration that White Eagle agreed to pay to

LNV under the Loan Agreement—somehow constitutes unmatured interest and, therefore, gives rise to OID.  However, for the same reasons that the Participation Interest does not create OID, neither does the Up-Front Fee.

*First*, a fee, by definition, cannot be "unmatured interest" under section 502(b)(2) of the Bankruptcy Code.  *See* 11 U.S.C. § 506(b) (identifying "fees" as distinct from interest).

*Second*, the Up-Front Fee is part of the exchange made between LNV and White Eagle under the Loan Agreement which included, among other things, LNV providing the initial draw under the Initial Loan Agreement.  The Up-Front Fee was fully earned, due and paid at inception when LNV provided the initial draw under the Initial Loan Agreement.  The fact that the parties' obligations to each other were netted out does not mean that OID was created.

*Third*, even if the Up-Front Fee did somehow result in OID, it was extinguished when the loans under the Initial Loan Agreement were refinanced in 2014 and then refinanced again in 2017 under the Loan Agreement.

*Fourth*, the Court should not expand the OID doctrine for the benefit of these Plaintiffs, given that the Debtors claim to be solvent.

## X.   <u>LNV Should Not Be Equitably Subordinated (Count XI)</u>

White Eagle seeks equitable subordination of all of LNV's claims, including transferring its liens to White Eagle's estate under section 510(c)(2) of the Bankruptcy Code.  The Complaint falls far short of pleading a basis for such draconian relief.

Equitable subordination is an "extraordinary remedy which is applied sparingly."  *In re HH Liquidation, LLC*, 590 B.R. at 298 (citations omitted); *see also In re Auto Specialties Mfg. Co.*, 153 B.R. 457, 480 (Bankr. W.D. Mich. 1993) (equitable subordination is appropriate only where conduct "shock[s] the conscience of the court").  In stressed debt negotiations between a lender and borrower, as here, a plaintiff must allege "behavior far more egregious" than

negotiating at arm's length in the lender's own interest. *See Official Comm. of Unsecured Creditors of Champion Enters. v. Credit Suisse (In re Champion Enters.)*, No. 10-50514 (KG), 2010 Bankr. LEXIS 2720, at \*26 (Bankr. D. Del. Sept. 1, 2010) ("Courts commonly recognize that a lender's goal to recoup the most amount of money possible on [its] loans, [is] an understandable and permissible desire.") (citation omitted).

Moreover, because LNV is not an insider of the Debtors, White Eagle "bears a higher burden of proof." *Official Comm. of Unsecured Creditors of Fedders N. Am. Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 554 (Bankr. D. Del. 2009). "It is insufficient for the objectant in [non-insider] cases merely to establish sharp dealings; rather, he must prove that the claimant is guilty of gross misconduct tantamount to fraud, overreaching, or spoliation to the detriment of others." *In re Pinetree Partners, Ltd.,* 87 B.R. 481, 488 (Bankr. N.D. Ohio 1988); *see also Waslow v. MNC Commercial Corp. (In re Paolella)*, 161 B.R. 107, 119 (E.D. Pa. 1993) ("The dearth of cases subordinating the claims of non-insiders is readily explained by the high threshold of misconduct that must be established by the objectant in non-insider cases.") (citations omitted). Additionally, "[p]articularized fact pleading regarding the allegedly egregious behavior is required." *In re Champion Enters.*, 2010 Bankr. LEXIS 2720, at \*25. Plaintiffs fall far short of this high burden.[42]

### A.    There Is No Egregious, Conscience-Shocking Conduct Here

Plaintiffs rely on the same allegations discussed above—particularly that, pursuant to

---

[42]   Plaintiffs assert the bare conclusion that LNV is an insider of the Debtors "[d]ue to its control over White Eagle." Complaint ¶ 141. Plaintiffs cite only LNV's approval rights over the disposition of the collateral securing its loan. *See id.* ¶ 64 (noting that White Eagle cannot acquire, sell or abandon its collateral assets without LNV's permission). These are standard protections afforded to any secured lender and do not make LNV an insider of the Debtors. *See In re Paolella*, 161 B.R. at 118 (rejecting claim of secured lender's insider status where lender "did not participate in the debtor's management, determine its operating decisions, or have any presence on its board"); *In re Champion Enters*, 2010 Bankr. LEXIS 2720, at \*18.

their bargained-for restrictions in the Loan Agreement, White Eagle was unable to dividend additional cash to Emergent.  Complaint ¶ 143.  As noted, Plaintiffs do not plead the particulars of any of this, and even if accepted, LNV's exercise of its contractual discretion is neither egregious nor shocking.  Plaintiffs' claim that LNV "forced" White Eagle to file for bankruptcy, *id.*, is another conclusion devoid of any particularized facts and is undermined by Plaintiffs' assertions that White Eagle is solvent.  *See In re Fedders N. Am., Inc.*, 405 B.R. at 554 (dismissing equitable subordination claim "[b]ecause the complaint does not plead any facts that would support such a finding, let alone plead them with particularity").  None of this even approaches the level of "very substantial misconduct involving moral turpitude" that Plaintiffs would have to show to subordinate LNV's lien.  *In re Paolella*, 161 B.R. at 119.

Moreover, Plaintiffs fail to show that any of LNV's conduct resulted in injury to other creditors, as required.  *See In re SubMicron Sys. Corp.*, 432 F.3d at 462 ("[B]ecause the District Court found in our case, through a proper exercise of its discretion, that no injury resulted to SubMicron's unsecured creditors as a result of the Lenders' dealings with Akrion, we need not reach the issue of inequitable conduct in order to affirm the District Court's equitable subordination holding.").

### B.    LNV's Claim Cannot Be Subordinated To Unsecured Claims

Plaintiffs allege that White Eagle is solvent and, therefore, unsecured creditors are entitled to payment in full.  As a result, there is no possible harm to unsecured creditors here, precluding subordination as a matter of law.[43]  *Kalisch v. Maple Trade Fin. Co. (In re Kalisch)*,

---

[43]   Given that the Debtors' proposed plan [D.I. 165] purports to pay unsecured creditors in full, Plaintiffs' relief cannot be narrowly tailored to address actual harm to creditors, as required.  *In re SubMicron Sys. Corp.*, 432 F.3d at 462 (emphasizing that equitable subordination shall be applied "only to the extent necessary to offset specific harm that creditors have suffered on account of the inequitable conduct").

413 B.R. 115, 133 (Bankr. S.D.N.Y. 2008) ("In all cases concerning equitable subordination actual harm to creditors is a necessary component[.]"); *see also Bird v. SKR Credit, Ltd. (In re Digital bridge Holdings, Inc.)*, No. 10-34499, 2015 Bankr. LEXIS 3314, at *31 (Bankr. D. Utah Sept. 30, 2015) ("Claims for equitable subordination under 11 U.S.C. §510(c) are creditor-based claims, not debtor-based claims."); *The Holders of Class C Common Stock of Rimsat, Ltd. v. Kauthar Sdn Bhd (In re Rimsat, Ltd.)*, 229 B.R. 910, 912 (Bankr. N.D. Ind. 1998) (equitable subordination is especially inappropriate in solvent debtor cases).

### C.     LNV's Participation Interest Cannot Be Subordinated To Emergent's Equity

White Eagle also urges that LNV's Participation Interest should be subordinated to existing *equity*, that is, to the ultimate parent Emergent. This fails. The Participation Interest is not equity—it is a component of LNV's secured claim consisting of a 45% share of cash remaining after various stages of the Loan Agreement's waterfall—and therefore cannot be subordinated to equity. *See Shubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 414 (3d Cir. 2009) ("[Section] 510(c) . . . clearly incorporate[s] the distinction between claims and interests such that creditors' claims may not be equitably subordinated to equity interests."); *Adelphia Recovery Tr. v. Bank of Am., N.A.*, 390 B.R. 80, 99 (S.D.N.Y. 2008) ("[A] given claim may not be subordinated to an equity interest, but only to another claim.").

Further, subordinating LNV's Participation Interest to Emergent's equity would effectively eliminate the Participation Interest entirely, because Emergent's equity is of unlimited potential value and, therefore, there is no level at which Emergent can receive enough of a distribution to provide for a further distribution to junior stakeholders. This harsh result is wholly disproportionate to any alleged harm. *See In re HH Liquidation, LLC*, 590 B.R. at 219 ("The Third Circuit has described the equitable subordination doctrine as 'remedial, not penal,

and it should be applied only to the extent necessary to offset specific harm that creditors have suffered on account of the inequitable conduct.'") (quoting *In re SubMicron Sys. Corp.*, 432 F.3d at 462). It would also result in equitable disallowance of the Participation Interest, which is not a cognizable remedy under the Bankruptcy Code. *See In re Hercules Offshore, Inc.*, 565 B.R. 732, 760 (Bankr. D. Del. 2016) ("[B]ankruptcy courts routinely reject equitable disallowance as a remedy under the Code."); *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC),* 515 B.R. 117, 157 (Bankr. S.D.N.Y. 2014) ("Bankruptcy Code § 510(c) provides for the remedy of equitable subordination, not equitable disallowance. Equitable disallowance is inconsistent with equitable subordination, and frankly, would eviscerate the principle of equitable subordination by disallowing a claim under the same set of facts.") (citations omitted).

## XI.     White Eagle Executed Releases That Bar Its Claims To Recharacterize And Negate The Participation Interest And The Up-Front Fee

Plaintiff White Eagle seeks four declaratory judgments that attack the Participation Interest and the Up-Front Fee and seek to render a significant portion of each unenforceable. Plaintiffs ask the Court for declarations that the Participation Interest is actually "unmatured interest" that must be disallowed (Count VII); in the alternative, that it is actually equity and should be recharacterized as such (Count VIII); and, also in the alternative, that it creates OID that must be disallowed (Count IX). Plaintiffs also seek a declaratory judgment that the Up-Front Fee is OID that should be disallowed (Count X). But in executing the Loan Agreement, White Eagle agreed to a comprehensive release of ***all*** claims or causes of action relating in any way to the Loan Agreement. Loan Agreement § 13.16. White Eagle cannot now seek declaratory judgments that the provisions of the Loan Agreement are something other than what the Loan Agreement provides. Moreover, each of these claims is based solely on the Loan Agreement itself, not on any events arising after its execution. *See generally* Complaint ¶¶ 113-

138.  This release was part of the consideration that White Eagle provided in exchange for the inception and continuation of its facility.

Under New York law, "a valid release which is clear and unambiguous on its face and which is knowingly and voluntarily entered into will be enforced as a private agreement of the parties." *Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.)*, 361 B.R. 369, 406 (Bankr. S.D.N.Y. 2007); *see also Baidu, Inc. v. Register.com, Inc.*, 760 F. Supp. 2d 312, 317 (S.D.N.Y. 2010) ("[P]arties, especially those of equal bargaining power, should be able to rely upon the general New York rule that enforces contracts for the release of claims of liability."). Bankruptcy courts routinely enforce prepetition releases. *See, e.g., JLL Consultants, Inc. v. Hormel Foods Corp. (In re AgFeed USA, LLC)*, 2015 Bankr. LEXIS 4272, at *13-15 (Bankr. D. Del. Dec. 15, 2015) (enforcing prepetition release and dismissing adversary complaint); *Official Comm. of Unsecured Creditors of Champion Enters. v. Credit Suisse (In re Champion Enters.)*, Adv. Pro. No. 10-50514 (KG), 2012 Bankr. LEXIS 4009, at *83-84 (Bankr. D. Del. Aug. 30, 2012) (same).[44]

Counts VII, VIII, IX and X ask the Court to re-write the contract to recharacterize the Participation Interest, the advances made by LNV or the Up-Front Fee as something (equity, OID or interest) other than what the Loan Agreement provides, for the benefit of equity-holder

---

[44]  Although this Court has previously declined to dismiss a fraudulent transfer claim based on a prepetition release, that decision does not apply to the claims at issue here because White Eagle is bringing declaratory judgment claims based on a prepetition agreement containing a comprehensive release. *See PAH Litig. Tr. v. Water St. Healthcare Partners L.P. (In re Physiotherapy Holdings, Inc.)*, (Nos. 13-12965 (KG), 15-51238 (KG)), 2016 Bankr. LEXIS 2810, at *53-55 (Bankr. D. Del. June 20, 2016).  Furthermore, unlike fraudulent transfer claims, Counts VII, VIII, IX and X are not causes of action created by the Bankruptcy Code.  *See Brookview Apts., L.L.C. v. Hoer (In re Weigh)*, 576 B.R. 189, 200 (Bankr. C.D. Cal. 2017) ("Recharacterization does not arise under the Bankruptcy Code."); *Highland Constr. Mgmt. Servs., LP v. Wells Fargo (In re Highland Constr. Mgmt. Servs.)*, 569 B.R. 673, 681 (E.D. Va. 2017) ("'[T]here is no specific provision of the Bankruptcy Code that allows courts to recharacterize claims.'").

Emergent. Each of these claims is barred by the release White Eagle freely gave, which should not be extinguished merely because White Eagle elected to file for bankruptcy.

Moreover, it is White Eagle itself, and not any creditor or third party, that is seeking these declaratory judgments. And if the allegations of the Complaint are accepted as true, the Debtors are solvent, so unsecured creditors would be paid in full regardless of the outcome of this litigation and would not share in any benefit from this litigation. Holding White Eagle to the terms of its own contract therefore will not prejudice unsecured creditors (if there are any here), further demonstrating that the release should be upheld.

## XII.    The Complaint Should Be Dismissed With Prejudice

Where a Plaintiff has already amended a complaint but failed to cure its defects, leave to further amend should be denied. *See Perlmutter v. Salton, Inc.*, No. 09-690-GMS, 2010 U.S. Dist. LEXIS 100659, at *15–16 (D. Del. Sept. 24, 2010). After LNV filed its motion to dismiss [D.I. 29], Plaintiffs amended their complaint almost three weeks later having had the benefit of seeing LNV's arguments. There is no basis for another attempt. Furthermore, as shown above, many of Plaintiffs' claims are barred by the express terms of the Loan Agreement, which cannot be changed or remedied with additional pleading. And Counts VII, VIII, IX and X are all based solely on the express terms of the Loan Agreement, not on any other facts that could be developed in discovery, and thus rise or fall on the strength of the Complaint. Further leave to amend would thus be futile, and the Complaint should be dismissed with prejudice.

## CONCLUSION

WHEREFORE, LNV respectfully requests that the Court enter an order, substantially in the form attached to the Motion as Exhibit A, granting the Motion and such other and further relief as this Court deems just and proper.

Dated: April 17, 2019
      Wilmington, Delaware

Respectfully submitted,

*/s/ Jeffrey M. Schlerf*
Jeffrey M. Schlerf (No. 3047)
Carl D. Neff (No. 4895)
**FOX ROTHSCHILD LLP**
919 North Market St., Suite 300
Wilmington, DE 19801
Telephone: (302) 654-7444
Facsimile: (302) 463-4971
jschlerf@foxrothschild.com
cneff@foxrothschild.com

Thomas E Lauria (admitted *pro hac vice*)
**WHITE & CASE LLP**
Southeast Financial Center
200 S. Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
tlauria@whitecase.com

–and–

David M. Turetsky (admitted *pro hac vice*)
Andrew T. Zatz (admitted *pro hac vice*)
Kimberly A. Haviv (admitted *pro hac vice*)
Samuel P. Hershey (admitted *pro hac vice*)
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, NY 10020-1095
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
dturetsky@whitecase.com
azatz@whitecase.com
kim.haviv@whitecase.com
sam.hershey@whitecase.com

–and–

Jason N. Zakia (admitted *pro hac vice*)
**WHITE & CASE LLP**
227 West Monroe Street, Suite 3900
Chicago, IL 60606-5055
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
jzakia@whitecase.com

*Attorneys for CLMG Corp.*
*and LNV Corporation*